UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | CV 15-5112 RGK (Ex) | Date | February 1, 2016 |
|---|---|---|---|
| Title | *Giovanni Martinez et al. v. Flower Foods, Inc. et al.* | | |

| Present: The Honorable | R. GARY KLAUSNER, U.S. DISTRICT JUDGE | |
|---|---|---|
| Sharon L. Williams | | Not Reported |
| Deputy Clerk | | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | | Attorneys Present for Defendants: |
| Not Present | | Not Present |

**Proceedings:** **(IN CHAMBERS)** Order re: Plaintiffs' Motion for Class Certification (DE 41)

## I.  INTRODUCTION

On May 7, 2015, Giovanni Martinez, Jose Almendariz, Martin Salazar, Humberto Lopez, and James King ("Plaintiffs") filed suit against Flowers Foods, Inc., Flowers Baking Co. of California, Flowers Baking Co. of Henderson, and Flowers Bakeries Brands, Inc. ("Defendants").

On November 6, 2015, Plaintiffs filed a First Amended Complaint ("FAC") alleging that Defendants improperly classified them as "independent contractors" instead of "employees." Plaintiffs further claim that the alleged mis-classification gave rise to various California Labor Code violations: (1) Failure to Reimburse Business Expenses (Cal. Lab. Code §2802), (2) Unlawful Deductions from Wages (§§221, 223, 400-410), (3) Failure to Provide Meal Breaks (Cal. Lab. Code §§226.7, 512), (4) Failure to Provide Rest Breaks (Cal. Lab. Code §§226.7, 1194), (5) Failure to Furnish Accurate Wage Statements (Cal. Lab. Code §§226, 226.3), and (6) Unfair Competition (Bus. & Prof. Code §17200).

Presently before the Court is Plaintiffs' Motion for Class Certification. For the following reasons, the Court **DENIES** Plaintiffs' motion.

## II.  FACTUAL BACKGROUND

Defendant Flowers Foods, Inc., through approximately 40 baking company subsidiaries, manufactures bakery products and distributes them to retail outlets, restaurants, and institutional customers throughout the United States. At issue in the instant action are Defendant Flowers Foods Inc.'s operations in the Southern California region.

Defendant Flowers Baking Co. of California ("Flowers California") started operations in Southern California on February 25, 2013, employing two groups of drivers to service about 270 routes.

The first group of drivers, approximately 60 in number, transferred from another company, Flowers-Holsum LLC, that ceased operations on February 23, 2013. This first group of drivers sold back their existing routes to Flowers-Holsum and entered into new Distributor Agreements with Flowers California, which classified them as "independent contractors" and assigned them new routes. Plaintiffs Martinez, Almendariz, and Salazar were each originally Flowers-Holsum drivers who converted to become Flowers California drivers in February 2013.

The second group of drivers, approximately 200 in size, were entirely new workers who completed training and a probationary service period before purchasing their routes through a Distributor Agreement with Flowers California. Plaintiffs King and Lopez fall into this second class of drivers; they completed training and signed new Distributor Agreements with Flowers California in Spring 2013.

In February 2014, Flowers California transferred its Southern California operations to Defendant Flowers Baking Co. of Henderson ("Flowers Henderson"). Plaintiffs allege that Defendants have improperly classified them as "independent contractors" instead of "employees," and deprived them of various rights mandated by the California Labor Code. They seek to certify the following class:

> All persons who have personally serviced a territory in Southern California (i.e., areas south of Visalia to the Mexican Border) under a Flowers Baking Company of California and/or Flowers Baking Company of Henderson "Distributor Agreement" that they entered into on behalf of themselves or entities in which they have a majority ownership interest (referred to as "Distributors") during the period commencing February 25, 2013 through trial in this action.

(Pl.s' Mot. For Class Certification 1 n.1, ECF No. 41.)

Plaintiffs claim that, as a result of the alleged misclassification, Defendants have committed the following violations: (1) Failure to Reimburse Business Expenses (Cal. Lab. Code §2802), (2) Unlawful Deductions from Wages (§§221, 223, 400-410), (3) Failure to Provide Meal Breaks (Cal. Lab. Code §§226.7, 512), (4) Failure to Provide Rest Breaks (Cal. Lab. Code §§226.7, 1194), (5) Failure to Furnish Accurate Wage Statements (Cal. Lab. Code §§226, 226.3), and (6) Unfair Competition (Bus. & Prof. Code §17200).

### III. **JUDICIAL STANDARD**

For certification of a class action under Federal Rule of Civil Procedure 23, the plaintiff bears the burden of establishing each of the prerequisites set forth in Rule 23(a). *Hanon v. Dataproducts, Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Rule 23(a) requires that "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

In addition to finding that the requirements of Rule 23(a) have been satisfied, the Court must also find that at least one of the following three conditions of Rule 23(b) is satisfied: (1) the prosecution of separate actions would create risk of (a) inconsistent or varying adjudications, or (b) individual adjudications dispositive of the interests of other members not a party to those adjudications; (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class; or (3)

the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b).

When considering Rule 23 class certification, a district court may look beyond the pleadings, even to issues overlapping with the merits of the underlying claims, in order to ensure that Rule 23 requirements are actually met and not simply presumed from the pleadings. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551-52 (2011). Therefore, the Court provides a brief overview of the substantive law at issue.

### A. California's Worker-Classification Law

In determining a worker's legal classification as either "employee" or "independent contractor," the principal test in California is "whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 988 (9th Cir. 2014) (citation omitted).

While the right-to-control test is the touchstone of worker classification, California law also considers several secondary factors, often termed the *Borello* factors after the eponymous case in which the factors were first articulated:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 769 P.2d 399, 404 (Cal. 1989). "The individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations." *Borello*, 769 P.2d at 404 (citation omitted).

### B. California's Wage-and-Hour Law

Plaintiffs allege violations of the following California Labor Code provisions: (1) Meal breaks, (2) Rest Breaks, (3) Unlawful Deductions, and (4) Expense Reimbursement.

#### 1. *Meal and Rest Breaks*

"[California] law obligates employers to afford their nonexempt employees meal periods and rest periods during the workday." *Brinker Rest. Corp. v. Superior Court*, 273 P.3d 513, 521 (Cal. 2012) (citing Cal. Lab. Code §§ 226.7, 512). The meal period requirements are codified at § 512(a) of the California Labor Code, requiring employers to provide a 30-minute meal period for employees who work more than five hours and a second 30-minute meal period for employees who work more than ten hours. The rest period requirements are embodied in a Wage Order issued by the Industrial Welfare

Commission.[1] IWC wage order No. 5–2001 (Cal. Code Regs., tit. 8, § 11050). The Wage Order requires employers to provide 10 minutes of rest time for every four hours worked or major fraction thereof unless the employee's entire workday consists of less than 3.5 hours. *Id.* In other words, "Employees are entitled to 10 minutes rest for shifts from three and one-half to six hours in length, 20 minutes for shifts of more than six hours up to 10 hours, 30 minutes for shifts of more than 10 hours up to 14 hours, and so on." *Brinker*, 273 P.3d at 529.

"The employer satisfies [its meal and rest break] obligation if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so." *Id.* at 536-37. An employer cannot contravene an official meal or rest break policy by imposing an informal practice that impedes or discourages its employees from taking compliant breaks. *Ricaldai v. U.S. Investigations Servs., LLC*, 878 F. Supp. 2d 1038, 1042 (C.D. Cal. 2012)

Plaintiffs allege that because Defendants improperly treated class members as independent contractors, they systematically failed to provide meal and rest breaks afforded to employees under the California Labor Code. (Pl.s' Mot. Class Certification at 17-18, ECF No. 41.)

        2. *Unlawful Deductions and Expense Reimbursement*

California law contains provisions disallowing unlawful deductions from employees' pay and requiring employers to reimburse employees for work-related expenses. California Labor Code §221 states, "It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." California Labor Code §2802(a) requires an employer to "indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties."

Plaintiffs allege that because Defendants improperly treated class members as independent contractors, they regularly took unlawful deductions from their pay and failed to reimburse them for various work-related expenses such as warehouse fees, maintenance and fuel costs, truck insurance, and computer devices. (Pl.s' Mot. Class Certification at 16-17, ECF No. 41.)

## IV. THE PARTIES' EVIDENCE

The Court has reviewed, and summarizes below, the evidence submitted by both parties. To the extent the Court has relied on any evidence to which the parties object, those objections are overruled.

### A. Plaintiffs' Evidence

Plaintiffs proffer several pieces of evidence to show that the issue of worker classification is amenable to class-wide proof. The centerpiece of Plaintiffs' argument is the Distributor Agreement ("DA"), which every class member signed before starting work as a driver with Defendants. (Pl.s' Mot. Class Certification, Rukin Decl. Ex. 6, at 69-124, ECF No. 41.) The DA governs the working relationship between Defendants and class members, setting forth guidelines to regulate various aspects of drivers' operations and compensation. For instance, the DA vests Defendants with authority to limit

---

[1] The Industrial Welfare Commission's wage orders are considered legislative regulations with legally binding effect on employers in California. *See Brinker*, 273 P.3d at 527-28 ("The IWC's wage orders are to be accorded the same dignity as statutes. They are 'presumptively valid' legislative regulations of the employment relationship, regulations that must be given 'independent effect' separate and apart from any statutory enactments.") (citations omitted).

the types, prices, and amounts of products sold in the sales territories, even prohibiting class members from selling competitive products. (*Id.* at §§5.1, 7.1, ECF No. 41.) Furthermore, the DA provides the common categories of expenses for which class members are responsible: franchise fees, bakery products, and sundry vehicle costs. (*Id.* at §§9.1-9.2, ECF No. 41.) Class members' weekly payment is also set forth in the DA, calculated as a percentage of net sales subject to certain deductions. (*Id.* at §8.1, ECF No. 41.) Finally, the DA also regulates class members' conduct by requiring them to comply with "Good Industry Practice." (*Id.* at §2.6, ECF No. 41.) While the DA merely provides a skeletal framework for "Good Industry Practice," the specific details are more fully articulated at a training referred to as "Distributor College" or "Distributor Orientation." (Pl.s' Mot. Class Certification, Rukin Decl. Ex. 12, at 69-124, ECF No. 41.) These standard Distributor Agreements are uniformly used across all territories. (Pl.s' Mot. Class Certification, Rukin Decl. Ex. 15, at 545-46, ECF No. 41.)

Next, Plaintiffs submit evidence attesting to the uniform organizational hierarchy of Defendants' operation. Each region, including the Southern California area, operates under a three-tiered management system comprised of a Vice President of Sales, a Director of Sales, and Branch Sales Managers. (Pl.s' Mot. Class Certification, Rukin Decl. Exs. 2-5, ECF No. 41.) Each Branch Sales Manager is charged with ten class members and shares their progress with a Director of Sales for the region who ultimately reports to the Vice President of Sales. The Branch Sales Managers ensure compliance with the DA by visiting stores, riding along with class members on routes, and inspecting products for freshness. (Pl.s' Mot. Class Certification, Rukin Decl. Ex. 15, at 568-590, ECF No. 41.) Moreover, class members are required to upload sales data on handheld devices, which are monitored by their various supervisors. (Pl.s' Mot. Class Certification, Rukin Decl. Ex. 16, at 600, ECF No. 41.)

Finally, Plaintiffs provide declarations from fourteen different drivers, all attesting to their uniform experience dealing with Defendants. (Pl.s' Mot. Class Certification, Rukin Decl. Exs. 20-33, ECF No. 41.) Plaintiffs provide a summary of the common facts to which all class members testify in their declarations. (Pl.s' Mot. Class Certification, Rukin Decl. Ex. 19, ECF No. 41.) For example, all fourteen drivers testify that Defendants dictate class members' routes, uniforms, customers, and products. (*Id.* at ¶¶ A-H, ECF No. 41.) Additionally, all declarants claim that Branch Sales Managers routinely visit and inspect their routes to ensure compliance with Defendants' guidelines for stocking and delivering products. (*Id.* at ¶¶ M-P, ECF No. 41.) Finally, the drivers all assert that Defendants require them to pay many business expenses such as vehicle repair, cell phone bills, warehouse fees, leasing fees for the handheld computers, and shrinkage charges for lost products. (*Id.* at ¶ X, ECF No. 41.)

### B. Defendants' Evidence

In rebuttal, Defendants submit their own evidence to demonstrate that class members' experiences differ widely, and, consequently, individualized issues predominate as to the question of how much control Defendants exercised.

First, Defendants submit affidavits from fifteen putative class members who currently work as drivers. (Def.s' Opp'n Mot. Class Certification Exs. 1-15, ECF No. 42.) A review of these declarations reveals that Defendants exercise varying levels of control and interact in diverse ways with different drivers. (*Id.*) For instance, many putative class members retain complete control over their schedules, routes, and product selection while others comply strictly with the requirements in the DA. (Def.s' Summ. Of Evid. Nos. 10-16, ECF No. 43.) Additionally, some drivers choose to wear Defendants' uniforms and adorn their trucks with Defendants' decals whereas other drivers opt to disregard such branding suggestions. (*Id.* at Nos. 22-23, ECF No. 43.)

Next, the declarations reveal that, despite Defendants' hierarchical structure, the Branch Sales Managers actually exercised varying degrees of supervision over class members. For instance, some

drivers reported frequent contact with and close monitoring by the Branch Sales Managers, while others testified that they rarely interacted with their assigned Branch Sales Managers. (Def.s' Summ. Of Evid. Nos. 26-27, ECF No. 43.) Moreover, not all of the putative class members attended the "Distributor Orientation" where Defendants communicated the fine details of the required conduct. (*Id.* at No. 5, ECF No. 43.)

Differences also exist with regard to the manner in which putative class members serviced their territories. For example, some class members were incredibly active in soliciting new business, launching advertisements, and experimenting with new product presentation while others merely maintained their existing business relationships with the same clients. (Def.s' Summ. Of Evid. Nos. 17-21, ECF No. 43.) Furthermore, some class members hired employees and helpers to service their territories whereas others personally serviced their own routes. (*Id.* at Nos. 3, 6-9, ECF No. 43.)

## V.     Rule 23(a)

Rule 23(a) requires that "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

### A.     Ascertainability

Although not expressly enumerated in Rule 23(a), an implicit threshold requirement for class certification is that any proposed class must be ascertainable. *Pryor v. Aerotek Sci., LLC,* 278 F.R.D. 516, 523 (C.D. Cal. 2011). "[T]he party seeking class certification must demonstrate that an identifiable and ascertainable class exists." *Mazur v. eBay Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009). "[A] class will be found to exist if the description of the class is definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member." *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998).

Defendants argue that, as currently defined, the proposed class does not allow for a manageable system of ascertaining class members. The class definition includes "[a]ll persons who have *personally serviced* a territory in Southern California." (Pl.s' Mot. For Class Certification 1 n.1, ECF No. 41.) (emphasis added). According to Defendants, there is no feasible way to ascertain which drivers fall into this category because neither Defendants nor individual drivers uniformly maintained records reflecting whether a driver "personally serviced" his territory or used a helper instead. The Court agrees.

Numerous drivers have testified that they employed helpers, in varying numbers and for different intervals of time, to service their territories. (Def.s' Opp'n Mot. Class Certification Ex. 12 at ¶4; Ex. 6 at ¶9; Ex. 3 at ¶15; Ex. 10 at ¶13 ECF No. 42.) In fact, at least three of the five named Plaintiffs have also employed helpers to operate their routes. For example, Plaintiff Martinez employed helpers to service his territory for about six months while he was driving for a competitor company in another state. (*Id.* Ex. 22 at 37, ECF No. 42.) Likewise, Plaintiffs King and Salazar occasionally used helpers to service their territories. (*Id.* Ex. 21 at 133; Ex. 24 at 48, ECF No. 42.)

Of course, the mere use of helpers does not undermine ascertainability as long as there is an administratively feasible method to determine when a driver "personally serviced" his territory and when he employed helpers. No such method exists in the present case. Defendants' Senior Vice President for the Western Region testified that the company does not "track or record when [drivers] use helpers . . . [and] cannot recreate on any given day or other period of time whether or not a [driver] was personally servicing his distributorship or not." (Def.s' Opp'n Mot. Class Certification Ex. 30 at ¶11 and

Ex. 19 at 25, ECF No. 42.) Compounding matters further, various drivers, including the named Plaintiffs in this case, have acknowledged that they do not keep regular records of the helpers they have hired to service routes over the class period. (*Id.* Ex. 20 at 96; Ex. 21 at 145; Ex. 22 at 28; Ex. 24 at ¶62; Ex. 25 at 58; Ex. 5 at ¶13; Ex. 4 at ¶13, ECF No. 42.)

Plaintiffs rebut by citing to deposition testimony in which Defendants' corporate designee states that approximately 10% of drivers are "absentee owners" who hire helpers to operate their territories. (Def.s' Opp'n Mot. Class Certification Ex. 19 at 135-36, ECF No. 42.) Seizing on this language, Plaintiffs contend that Defendants have a method of accurately identifying which drivers are actively working their routes, thereby ameliorating any ascertainability flaws. Not so. Read in context, the deposition testimony Plaintiffs rely on actually belies their position. Defendants' corporate designee goes on to explain that the company does not keep any documentation as to "absentee owners" and merely relies on informal, anecdotal evidence from its Vice President of Sales. (*Id.* Ex. 25 at 136, ECF No. 42.) Moreover, the corporate designee testified that Defendants have no way of knowing whether a driver is personally servicing his route unless they actually see him enter the warehouse to load supplies, and even then such information is not documented. (*Id.* Ex. 25 at 137, ECF No. 42.)

Next, Plaintiffs contend that the lack of records does not impede ascertainability because drivers can simply self-identify as having personally serviced their route in a given time period. In support of this contention, Plaintiffs invoke several worker-misclassification class actions where courts supposedly held that individual drivers could self-identify as belonging to the class. *Bowerman v. Field Asset Servs., Inc.*, No. 13-CV-00057, 2015 WL 1321883, at *8 (N.D. Cal. Mar. 24, 2015); *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 608 (N.D. Cal. 2014); *In re FedEx Ground Package Sys., Inc., Employment Practices Litig.*, 283 F.R.D. 427, 460 (N.D. Ind. 2012). Having reviewed these cases, the Court finds that they stand for no such proposition.

In *Bowerman*, the court certified a class of cleaning vendors alleging that the defendant had misclassified them as independent contractors. *Bowerman*, 2015 WL 1321883 at *1. The class definition included vendors who had "*personally performed* property preservation work in California." *Id.* at *6 (emphasis added). The court encountered a problem with ascertainability because not all class members had personally performed work for defendants—some had hired helpers. Even more problematic, the defendant did not maintain records of which vendors had personally performed the work. In addressing this concern, the court stated:

> The vendor declarations submitted by both plaintiffs and [defendants] indicate that many if not most vendors will be able to self-identify as being in or out of the class. . . . [Defendant] states that it does not track or record which of its vendors have "personally performed" property preservation work . . . [but] this merely indicates that [defendant] itself does not track or record this information; it does not indicate that the information cannot be obtained. Where vendor testimony proves insufficient to establish the "personally performed" . . . requirement for class membership, documents produced by the vendors themselves will likely be able to provide additional corroboration.

*Id.* at *8.

The Court finds *Bowerman* distinguishable for two reasons. First, unlike the vendor declarations in *Bowerman*, the driver declarations in the instant action do no indicate that drivers will be able to self-identify. As evidenced by multiple driver declarations—including the Plaintiffs' own deposition

testimony—some drivers do not keep records of the instances in which they hired helpers to service their routes. (*Id.* Ex. 20 at 96; Ex. 21 at 145; Ex. 22 at 28; Ex. 25 at 58; Ex. 24 at ¶62; Ex. 25 at 58; Ex. 5 at ¶13; Ex. 4 at ¶13, ECF No. 42.) Second, it is unclear what evidence in the record prompted the *Bowerman* court to declare that "documents produced by the vendors themselves will likely be able to provide additional corroboration." *Bowerman*, 2015 WL 1321883 at *8. This Court, however, cannot say with the same certainty, based on the record in the instant case, that drivers will be able to produce documentary evidence corroborating their self-identification as class members.

The Court likewise finds *Villalpando* and *In re FedEx Ground Package Systems* inapposite. Neither of these cases actually analyzed the ascertainability question or expressly held that drivers may self-identify in the absence of records demonstrating class membership. *Villalpando* 303 F.R.D. 588; *In re FedEx Ground Package Sys.*, 283 F.R.D. 427. Both courts assumed without deciding that ascertainability had been satisfied, and, therefore, offer no help to Plaintiffs here. Instead of looking to these decisions for guidance, the Court turns to a case addressing a situation nearly identical to the case at hand. *Spencer v. Beavex, Inc.*, No. 05-CV-1501, 2006 WL 6500597 (S.D. Cal. Dec. 15, 2006).

In *Spencer*, plaintiffs sought to certify a class of drivers alleging worker misclassification. The class definition included only those drivers who personally serviced a territory, as opposed to using helpers, more than 51% of the time. *Spencer*, 2006 WL 6500597 at *5. Neither party maintained regular records reflecting who serviced a territory on any given day. *Id.* at *8. The only proof available existed in the form of route manifests that each driver filled out before any shift; however, such manifests were unreliable because, in some instances, a driver would sign the manifest but allow a helper to complete the route. *Id.* In light of such uncertainty, the court held, "Plaintiffs have failed to designate a reliable method of determining what percentage of a given driver's routes that driver actually drove, other than by examining that driver's route manifests." *Id.* at *9. The court continued to explain, "Although objective criteria might exist for determining class membership in the instant matter, the Court concludes that applying those criteria would be administratively infeasible. . . . [D]etermining class membership would be 'excessively complex,' rather than 'sufficiently facile.'" *Id.* at *9.

The Court finds the reasoning in *Spencer* particularly instructive, especially given the practical reality and inherent complexity of ascertaining individual class members where no reliable documentary evidence exists. Here, much like in *Spencer*, Plaintiffs have failed to proffer a reliable method of ascertaining which individual class members personally serviced their routes as opposed to using helpers at any given time. No regularly kept records exist. In the absence of such reliable documentary evidence, the Court is left to rely on piecemeal anecdotal evidence and individual drivers' memories dating back three years. Accordingly, the Court concludes that the proposed class does not satisfy the ascertainability requirement.

### B. Numerosity

Rule 23(a)(1) requires that the class be so "numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Generally, a class with over forty members satisfies the numerosity prerequisite. *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). "The Ninth Circuit has not offered a precise numerical standard; other District Courts have, however, enacted presumptions that the numerosity requirement is satisfied by a showing of 25-30 members." *Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 654 (C.D. Cal. 2000).

Here, numerosity is satisfied because Defendants' operation in Southern California consists of approximately 260 drivers, many of whom would likely fall within the proposed class.

### C. Commonality

"To show commonality, Plaintiffs must demonstrate that there are questions of fact and law that are common to the class. The requirements of Rule 23(a)(2) have 'been construed permissively,' and '[a]ll questions of fact and law need not be common to satisfy the rule.'" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (citations omitted). Commonality exists, and certification is proper, where the legality of a challenged policy poses a "significant question of law" that is "apt to drive the resolution of the litigation." *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 963 (9th Cir. 2013) cert. denied, 135 S. Ct. 53, 190 L. Ed. 2d 30 (2014).

Here, Plaintiffs have demonstrated that there are common questions of law and fact arising from Defendants' alleged misclassification. The common questions include (1) whether Defendants' Distributor Agreements and operational hierarchy exercised sufficient control to render the class members "employees" instead of "independent contractors," and (2) whether, as a result of designating class members "independent contractors," Defendants have violated California's labor code requirements. Plaintiffs have presented evidence showing that putative class members' claims stem from a common source in that they all worked for Defendants and they were all subject to the same company policies during the relevant class period. Therefore, Plaintiffs have met their burden to demonstrate commonality among class members. As discussed below, however, Plaintiffs have not satisfied the more exacting predominance requirement.

### C. Typicality

Rule 23(a)(3) requires that the claims of the representative plaintiff be typical of the claims of the class. Fed. R. Civ. P. 23(a)(3). "[R]epresentative claims are typical if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

Here, all five Plaintiffs worked as drivers for Defendants during the relevant class period. Furthermore, each of the Plaintiffs, at some point, "personally serviced" their respective territories, a requirement based on the class definition. Plaintiffs' allegations also mirror the claims of the putative class members; they all allege that Defendants misclassified them as "independent contractors" and, as a result, deprived them of various employee rights afforded by the California labor code. Accordingly, Plaintiffs have satisfied the typicality requirement.

### D. Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The prerequisite of adequacy is satisfied if (1) the named representative appears able to prosecute the action vigorously through qualified counsel, and (2) the named representative does not have antagonistic or conflicting interests with the unnamed members of the class. *See Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978).

Here, both prerequisites are satisfied, demonstrating that the named Plaintiffs and their chosen counsel are adequate class representatives. First, Plaintiffs' counsel submits a declaration attesting to the vast litigation experience he and his colleagues possess, especially in the context of wage-and-hour class action cases. (Pl.s' Mot. For Class Certification Kaufmann Decl., ECF No. 41.). Second, the record does not reflect any conflicts of interest between Plaintiffs and the putative members of the class.

Defendants posit that adequacy is not satisfied because some of the putative class members do not wish to disturb the current business relationship that exists between drivers and Defendants. Defendants submit declarations from eleven drivers who express hesitance about joining the current lawsuit. (Def.s' Summ. Of Evid. No. 42, ECF No. 43.) This argument is unavailing for several reasons.

First, the group of eleven drivers constitutes less than four percent of the entire potential class, and nothing in the record suggests that these drivers were randomly selected. Moreover, many of the drivers did not even express unequivocal objection to the current lawsuit; their answers merely demonstrated hesitance at the prospect of losing their autonomy as a result of this lawsuit. Therefore, the proffered declarations do not represent a randomly selected or numerically significant sample size from which to conclude that a majority of drivers object to the instant action. *O'Connor v. Uber Techs., Inc.*, No. C-13-3826, 2015 WL 5138097, at *12 (N.D. Cal. Sept. 1, 2015) ("Moreover, not only are the expressed views of these 400 drivers a statistically insignificant sample of the views of their fellow drivers and class members . . . there is nothing to suggest that these 400 drivers were randomly selected and constitute a representative sample of the driver population.")

Even more fatal for Defendants' position, the drivers' opinions expressed in the declarations do not actually bear on whether Plaintiffs are adequate class representatives. Just because a subset of the putative class may not agree with the lawsuit does not mean that certification is foreclosed. In fact, there will almost always be a group of putative class members who decide to opt out of a class action lawsuit; hence, the opt-out provision built into Rule 23. Fed. R. Civ. P. 23(c)(2) (mandating that classes certified under Rule 23(b)(3) must provide putative class members notice and an opportunity to opt-out). Defendants' argument here is not a new one; it has been raised—and rejected—by numerous district courts confronted with the same situation. *Norris-Wilson v. Delta-T Grp., Inc.*, 270 F.R.D. 596, 606 (S.D. Cal. 2010) ("Just because potential class members disagree with the spirit of an action doesn't mean it shouldn't be certified."); *Guifu Li v. A Perfect Franchise, Inc.*, No. 5:10-CV-01189, 2011 WL 4635198, at *9 (N.D. Cal. Oct. 5, 2011) ("The fact that all proposed class members may not like each other, or even that some potential class members may prefer their current employment situation, is not sufficient to defeat adequacy."). Accordingly, Plaintiffs have satisfied the adequacy requirement.

## VI. Rule 23(b)(3)

To qualify for certification under Rule 23(b)(3), a plaintiff must show (1) common questions "predominate over any questions affecting only individual members," and (2) class resolution is "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

The "predominance" prong is satisfied "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication." *Hanlon*, 150 F.3d at 1022 (quoting Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1777 (2d ed. 1986)). The "superiority" prong requires a consideration of: (1) class members' interests in individually controlling the prosecution or defense of separate actions, (2) the extent and nature of any litigation concerning the controversy already begun by or against class members, (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and (4) likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(a)-(d).

Plaintiffs argue that common questions predominate and class resolution is superior for both: (1) the worker misclassification claims and (2) the wage-and-hour claims. The Court discusses each category of allegations in turn.

### A. Whether Class Members are Employees or Independent Contractors

As discussed above, the question of whether Plaintiffs are employees or independent contractors under California law turns on the right-to-control test and the *Borello* factors. *Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1100 (9th Cir. 2014). At this juncture, the Court does not reach the merits to decide whether Defendants' operational structure actually treats Plaintiffs as employees. Instead, the only issue this Court must decide at the class certification stage is whether the question of worker

classification predominates across all class members.

To that end, the Court must ask whether Defendants' control over its drivers is sufficiently uniform to allow class-wide treatment or whether individualized issues predominate. *Villalpando*, 303 F.R.D. at 608. In determining whether individual variations are sufficient to defeat class certification, courts consider which of the secondary factors are affected by the individual issues as well as the significance of the factors implicated. *Ayala v. Antelope Valley Newspapers, Inc.*, 327 P.3d 165, 177 (Cal. 2014) ("[T]he impact of individual variations on certification will depend on the significance of the factor they affect."); *Norris-Wilson*, 270 F.R.D. at 608 (finding that individual factors do not predominate because "[a]t best, they touch on just three of the seven secondary factors articulated"); *Bowerman*, 2015 WL 1321883 at *11 (certifying a class where "differences among class members with respect to certain secondary factors did not interfere with a showing of predominance").

After reviewing the evidence in the record and the parties' arguments, the Court concludes that individual issues predominate and Plaintiffs have not satisfied the predominance requirement.

      1.     *Right to Control*

The linchpin of Plaintiffs' argument is the Distributor Agreement, which all putative class members signed before beginning work as drivers. Based on the uniform Distributor Agreement, Plaintiffs posit that the instant action is conducive to class-wide treatment because the Court will review the same evidence and facts pertaining to all class members. In retort, Defendants do not dispute the uniformity of Distributor Agreements; instead, they contend that each class members' practical reality differs widely and does not render the instant case amenable to class-wide proof. The question before this Court, then, is whether variations in practice can preclude class certification even when there exists a written agreement that, at least theoretically, can be applied uniformly.

The California Supreme Court has recently addressed this exact issue, stating, "While any written contract is a necessary starting point . . . the rights spelled out in a contract may not be conclusive if other evidence demonstrates a practical allocation of rights at odds with the written terms." *Ayala*, 327 P.3d at 174. Even though practical variations among workers must be considered, in the context of class certification, courts must be careful not to unduly rely on such differences as a basis to deny certification. *Ayala*, 327 P.3d at 174 ("[T]he existence of variations in the extent to which a hirer exercises control *does not necessarily show variation* in the extent to which the hirer possesses a right of control, or that the trial court would find any such variation unmanageable.") (emphasis added). Where, as here, there exists a uniform written agreement, the operative question is not simply whether practical variations among drivers demonstrate a difference in the actual exercise of control, but whether such variations reflect a more fundamental difference in the right to control.

In the present case, the variations among drivers do not merely evince a difference in Defendants' *exercise* of control; rather, the variations among drivers manifest a difference in the actual scope of Defendants' *right* to control. Plaintiffs make much of a provision in the Distributor Agreement that requires all drivers to comply with "Good Industry Practice." (Pl.s' Mot. Class Certification, Rukin Decl. Ex. 6, at §2.6, ECF No. 41.) According to Plaintiffs, the "Good Industry Practice" standard dictates all aspects of drivers' daily activities, including delivery schedules, supervision and monitoring, advertising requirements, and business development. The flaw in such an argument, however, is that "Good Industry Practice" is an immensely broad standard that does not actually mandate any specific behavior. Instead, the "Good Industry Practice Standard" merely sets forth a general framework within which variations abound depending on the practical reality in a given situation.

In retort, Plaintiffs concede that the "Good Industry Practice" standard is "broad and vague," but they contend that Defendants resolved any such ambiguity through the two-week training course known

as "Distributor College" or "Distributor Orientation." (Reply ISO Pl.s' Mot. Class Certification at 6:15-24, ECF No. 46.) Even if "Distributor College" filled in the gaps and set forth specific requirements to regulate drivers, not all drivers actually attended this training. (Def.s' Summ. Of Evid. No. 5, ECF No. 43.) Distributor College was only required for the second group of drivers who did not convert from Flowers-Holsum; in fact, four of the five Plaintiffs did not even attend Distributor College.[2] Therefore, any examination of the right to control would necessarily spawn a host of individualized inquiries

Consider, for instance, Plaintiffs' argument that the Distributor Agreements uniformly controlled drivers' delivery schedules. The Distributor Agreements merely require all drivers to "maintain[] proper service and delivery . . . in accordance with [the customer's] requirements." (Pl.s' Mot. Class Certification, Rukin Decl. Ex. 6, at §2.6, ECF No. 41.) Such a broad standard does not delineate the specific conduct that drivers must follow, nor does it demonstrate Defendants' supposedly vast and uniform control over class members. Instead, each driver's particular schedule is dictated by his or her customers' requirements. The evidence bears out this conclusion. First, the Distributor Agreement by its own terms requires deliveries to comply with the *customer's* requirements—it does not grant Defendants a right of control. Additionally, Defendants' Vice President of Distributor Operations testified that "different customers have different requirements and those variations need to be taken into account in determining good industry practice for that particular distributor." (Def.s' Opp'n Mot. Class Certification Ex. 29 at ¶7, ECF No. 42.) Finally, numerous driver declarations indicate that their schedules varied based on specific territories and customer expectations. (Def.s' Summ. Of Evid. Nos. 10-12, ECF No. 43.)

As another example, take Plaintiffs' contention that Branch Sales Managers uniformly exercised monitoring and supervision over drivers. The descriptions of Defendants' organizational hierarchy do not actually prove any right to control through supervision or monitoring. (Pl.s' Mot. Class Certification, Rukin Decl. Exs. 2-5, ECF No. 41.) Instead, the evidence provided describes the Branch Sales Manager as a position designed to help and offer guidance for drivers in the field. (Pl.s' Mot. Class Certification, Rukin Decl. Ex. 2, ECF No. 41.) Additionally, the deposition testimony Plaintiffs submit includes a transcript in which Defendants' corporate designee explains that Branch Sales Managers help drivers by searching for growth opportunities in their territories. (Pl.s' Mot. Class Certification, Rukin Decl. Ex. 15, at 568-590, ECF No. 41.) Finally, while the Distributor Agreement requires drivers to use handheld devices that transmit sales data, nothing in the contract specifies that Defendants have any right to control drivers through supervision or monitoring. (Pl.s' Mot. Class Certification, Rukin Decl. Ex. 6, at §10.1, ECF No. 41.) In the absence of a uniform policy, then, the Court must consider whether Defendants' practice demonstrates a right to control. Such an inquiry, however, necessitates individualized examination because different drivers experienced varying degrees of supervision. (Def.s' Summ. Of Evid. Nos. 26-27, ECF No. 43.)

One final example appears in the context of drivers' business development strategies. The Distributor Agreement provides that drivers may use their own advertising materials and may, but are not required to, participate in promotions and advertising schemes organized by Defendants. (Pl.s' Mot. Class Certification, Rukin Decl. Ex. 6, at §§13.1-13.2, ECF No. 41.) Moreover, the Distributor Agreement does not require any particular manner of soliciting new business or expanding a driver's customer base, which yields a multitude of business development strategies among drivers. (Def.s'

---

[2] Plaintiffs acknowledge that not all drivers in the putative class attended "Distributor College," but they argue that Defendants retain the right to compel any driver to attend the college. (Reply ISO Pl.s' Mot. Class Certification, ECF No. 46.) The provision Plaintiffs rely on for this argument states no such thing. The Distributor Agreement states, "We require all *prospective distributors* to complete . . . 'Distributor College.'" (Pl.s' Mot. Class Certification Ex. 6, at 45, ECF No. 41.) The DA only mandates attendance for prospective distributors, not full-fledged drivers who have already purchased their routes.

Summ. Of Evid. Nos. 17-21, ECF No. 43.) Accordingly, the evidence undermines any argument that Defendants uniformly controlled drivers' manner of operating their respective businesses in their territories.

The preceding analysis is not meant to indicate that Defendants did not exercise any control over class members. Indeed, even though the Distributor Agreement does not confer the uniform control that Plaintiffs claim, Defendants very well could have governed some drivers with an iron fist and dictated the specific details of their operation. At this stage, however, the Court merely asks whether Plaintiffs have produced enough evidence to show that the question of control is amenable to class-wide proof.[3] Based on the evidence in the record, the Court must answer that question in the negative. *Narayan v. EGL, Inc.*, 285 F.R.D. 473, 480 (N.D. Cal. 2012) ("[T]he *Borello* factors suggest that the court cannot look only to the details of the relationship as specified between the two parties but must also consider the employer's and presumptive employee's situations. . . . The evidence shows that, while they may have each interacted on the same terms with defendants, class members were situated very differently in their operations.").

2. *Secondary Factors*

Moving beyond the right-to-control test, the Court also finds that one crucial secondary factor is not susceptible to common proof. In the instant case, the "distinct business or occupation" factor necessarily requires highly individualized questions because of drivers' varying use of helpers and sub-drivers. In fact, several other district courts, addressing situations closely resembling the facts at hand, have denied class certification because of variations among putative class members' reliance on helpers or employees. *Spencer v. Beavex, Inc.*, 2006 WL 6500597 at *16 ("The issue of what use different drivers make of the option to use back-ups and subs is a highly individualized question of fact."); *Bowerman*, 2014 WL 4676611 at *11 ("The second factor, distinct occupation or business, will also cause differentiation within the class. Some have many employees and an administrative infrastructure, compete in the marketplace, and advertise. Others only work for [defendat]."); *Narayan*, 285 F.R.D. at 478 ("Some putative class members . . . had their sub-drivers drive on their behalf for [defendant] while personally providing services to other companies. . . . In contrast, other class members did not have sub-drivers and/or drove exclusively for [defendant] while their contract was in force.").

Here, the evidence unequivocally demonstrates that Defendants do not possess any right to control a class member's process of hiring and utilizing helpers or sub-drivers. The Distributor Agreement leaves drivers "free to engage such persons as . . . appropriate to assist in discharging [their] duties." (Pl.s' Mot. Class Certification, Rukin Decl. Ex. 6, at §16.2, ECF No. 41.) Granted, the DA does hold a class member personally responsible for any breach committed by his or her sub-drivers, but such a provision does not confer any control over the hiring and supervision of helpers. Given the lack of a uniform policy governing the use of helpers, the Court must delve into the unique circumstances of each driver's specific operation to evaluate how much control, if any, Defendants exercised over sub-drivers. The evidence reveals that drivers' experiences varied considerably with respect to the use of helpers or

---

[3] The Court also notes that several provisions in the Distributor Agreement demonstrate a uniform right to control certain aspects of drivers' operations. For instance, the DA vests Defendants with authority to limit the types, prices, and amounts of products sold in the sales territories. (Pl.s' Mot. Class Certification, Rukin Decl. Ex. 6, at §§5.1, 7.1, ECF No. 41.) Furthermore, the DA provides the common categories of expenses for which class members are responsible: franchise fees, bakery products, and sundry vehicle costs. (*Id.* at §§9.1-9.2, ECF No. 41.) The existence of some uniform control, however, does not automatically signify that common issues predominate. Rather, the Court must consider the entire record in conjunction with all aspects of the Plaintiffs' occupation to determine whether common issued predominate. Here, the individual issues predominate over any commonalities.

sub-drivers. Some class members relied exclusively on helpers to service their routes and essentially took supervisory roles while other class members have never hired a sub-driver to operate their territories. (Def.s' Summ. Of Evid. Nos.6-8, ECF No. 43.) Therefore, the individualized question of whether a given driver engaged in a distinct business or occupation cannot be resolved on a class-wide basis.

In sum, the Court concludes that individual issues predominate as to the question of whether Defendants improperly classified class members as independent contractors instead of employees.

### B. Substantive Labor Code Violations

Plaintiffs also argue that common issues predominate as to the substantive labor code violations. Defendants' corporate designee testified that the company did not maintain any written policies for meal and rest breaks, nor did it issue any premium pay for missed breaks. (Pl.s' Mot. Class Certification Rukin Decl. Ex. 16, at 614-15, ECF No. 41.) The corporate designee also acknowledged that Defendants do not issue reimbursements for work-related expenses borne by the drivers. (Pl.s' Mot. Class Certification Rukin Decl. Ex. 16, at 616-17, ECF No. 41.)

The Court need not reach the issue of whether common questions predominate as to the substantive labor code violations. To recover for substantive labor code violations, Plaintiffs must first establish that they are employees. To establish that they are employees, Plaintiffs must prevail on their misclassification claim. As the Court explained above, Plaintiffs have not demonstrated that common issues predominate as to the misclassification claim. Therefore, regardless of how the Court answers the predominance question in the context of the wage-and-hour claims, individualized issues will invariably exist as to Plaintiffs' threshold misclassification claim, rendering the entire case unsuitable for class certification.

## VII. CONCLUSION

In light of the foregoing, the Court **DENIES** Plaintiffs' Motion for Class Certification.

**IT IS SO ORDERED.**

  :  

Initials of Preparer