# EXHIBIT A

JOHNNIE A. JAMES, CA Bar No. 144091
johnnie.james@ogletreedeakins.com
ALEXANDER M. CHEMERS, CA Bar No. 263726
alexander.chemers@ogletreedeakins.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, CA 90071
Telephone: 213.239.9800
Facsimile: 213.239.9045

KEVIN P. HISHTA, *Admitted pro hac vice*
kevin.hishta@ogletreedeakins.com
A. CRAIG CLELAND, *Admitted pro hac vice*
craig.cleland@ogletreedeakins.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
One Ninety One Peachtree Tower
191 Peachtree St. NE, Suite 4800
Atlanta, GA 30303
Telephone: 404.881.1300
Facsimile: 404.870.1732

MARGARET SANTEN HANRAHAN, *Admitted pro hac vice*
maggie.hanrahan@ogletreedeakins.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
201 South College Street, Suite 2300
Charlotte, NC 28244
Telephone: 704.342.2588
Facsimile: 704.342.4379

Attorneys for Defendants
FLOWERS FOODS, INC., FLOWERS BAKING CO. OF
CALIFORNIA, FLOWERS BAKING CO. OF HENDERSON,
and FLOWERS BAKERIES BRANDS, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIOVANNI MARTINEZ, JOSE ALMENDARIZ, JAMES KING, MARTIN SALAZAR, and HUMBERTO LOPEZ, <br><br> Plaintiffs, <br><br> v. <br><br> FLOWERS FOODS, Inc., FLOWERS BAKING CO. OF CALIFORNIA, FLOWERS BAKING CO. OF HENDERSON, FLOWERS BAKERIES BRANDS, Inc., and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No. 2:15-cv-05112 RGK(Ex) <br><br> **DEFENDANTS' RULE 26(a)(2) DISCLOSURE OF JOSEPH A. KROCK, Ph.D.** <br><br> Complaint Filed: July 7, 2015 <br> Trial Date: August 2, 2016 <br><br> District Judge: R. Gary Klausner <br> Magistrate Judge: Charles F. Eick |

Case No. 2:15-cv-05112 RGK(Ex)

DEFENDANTS' RULE 26(A)(2) DISCLOSURE OF JOSEPH A. KROCK, PH.D.

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

Pursuant to Federal Rules of Civil Procedure Rule 26(a)(2), Defendants Flowers Foods, Inc., Flowers Baking Co. of California, Flowers Baking Co. of Henderson, and Flowers Bakeries Brands, Inc. (collectively, "Defendants") hereby disclose the identity of the following person who may be used at trial to present evidence under Rule 702, 703, or 705 of the Federal Rules of Evidence: Joseph A. Krock, Ph.D. Dr. Krock charges $475.00 per hour for his work related to this matter. Dr. Krock's expert report, as well as his *curriculum vita* which includes a list of cases for which he has provided either trial or deposition testimony, is attached hereto as Exhibit "A."

Defendants further reserve their rights to do the following:  (i) call as expert witnesses at trial any of the experts designated by Plaintiffs; (ii) to augment this list should Plaintiffs counter-designate additional experts; (iii) to call experts not listed above as rebuttal witnesses to the testimony of any other expert witness' testimony offered at trial; and (iv) to amend the attached reports with respect to the general substance of anticipated testimony of the witnesses designated.

DATED:  May 4, 2016

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.


By: _____
Johnnie A. James
Alexander M. Chemers
Kevin P. Hishta
Margaret Santen Hanrahan
A. Craig Cleland

Attorneys for Defendants
FLOWERS FOODS, INC., FLOWERS BAKING CO. OF CALIFORNIA, FLOWERS BAKING CO. OF HENDERSON, and FLOWERS BAKERIES BRANDS, INC.

# EXHIBIT A

**MARTINEZ, ET AL., v. FLOWERS FOODS, INC., ET AL.**

**Expert Report of Joseph A. Krock, Ph.D.**

**TABLE OF CONTENTS**

| Section | Page | Para(s) |
|---|---|---|
| I. Introduction | 3 | 1-6 |
| II. Assignment | 5 | 7-9 |
| III Summary of Conclusions | 6 | 10-11 |
| IV. Discussion | 6 | |
|    A. Jose Almendariz | 6 | |
|       i. Territory Valuation – Territories 6758 & 6768 | 6 | 12-17 |
|          a. Relative Valuation – Ratio Analysis | 8 | 18-22 |
|          b. Discounted Cash Flow Analysis | 10 | 23-29 |
|       ii. Business Expenses | 12 | |
|          a. Alleged Unreimbursed Business Expenses | 12 | 30-36 |
|          b. Alleged "Unlawful Deductions" | 13 | 37 |
|          c. Net Profits | 14 | 38-40 |
|          d. Hourly Rate | 15 | 41-47 |
|       iii. Alleged Missed Meal and Rest Periods | 17 | 48-50 |
|       iv. Alleged Inaccurate Wage Statement Penalties | 17 | 51 |
|    B. James King | 18 | 52 |
|       i. Territory Valuation – Territory 6472 | 18 | 53 |
|          a. Relative Valuation – Ratio Analysis | 18 | 54 |
|          b. Discounted Cash Flow Analysis | 19 | 55 |
|       ii. Business Expenses | 19 | |
|          a. Alleged Unreimbursed Business Expenses | 19 | 57-62 |

– 1 –

b. Alleged "Unlawful Deductions" ...................................20        63

c. Net Profits .................................................................21        64

d. Hourly Rate ...............................................................21        65-67

iii. Alleged Missed Meal and Rest Periods .....................22        68-69

iv. Alleged Inaccurate Wage Statement Penalties ..........22        70

C. Humberto Lopez ............................................................22

i. Territory Valuation – Territory 6542 ...........................22        71

a. Relative Valuation – Ratio Analysis .............................23        72

b. Discounted Cash Flow Analysis ...................................23        73-75

ii. Business Expenses .......................................................24

a. Alleged Unreimbursed Business Expenses ...................24        76-80

b. Alleged "Unlawful Deductions" ...................................25        81

c. Net Profits .................................................................25        82

d. Hourly Rate ...............................................................25        83

iii. Alleged Missed Meal and Rest Periods .....................26        85-86

iv. Alleged Inaccurate Wage Statement Penalties ..........27        87

D. Giovanni Martinez .......................................................27        88

i. Territory Valuation – Territory 6736 ...........................27        89-93

a. Relative Valuation – Ratio Analysis .............................28        94-95

b. Discounted Cash Flow Analysis ...................................29        96-97

ii. Business Expenses .......................................................29

a. Alleged Unreimbursed Business Expenses ...................29        98-101

b. Alleged "Unlawful Deductions" ...................................30        102

c. Net Profits .................................................................31        103

d. Hourly Rate ...............................................................31        104-106

iii. Alleged Missed Meal and Rest Periods .....................32        107-108

iv. Alleged Inaccurate Wage Statement Penalties ..........32        109

E. Martin Salazar ...............................................................33

    i. Territory Valuation – Territories 6821 & 6822 ........................33       110

        a. Relative Valuation – Ratio Analysis .............................33       111

        b. Discounted Cash Flow Analysis ...................................34     112-113

    ii. Business Expenses ....................................................................34

        a. Alleged Unreimbursed Business Expenses ...................34    114-117

        b. Alleged "Unlawful Deductions" ...................................35       118

        c. Net Profits .................................................................35       119

        d. Hourly Rate ...............................................................36    120-122

    iii. Alleged Missed Meal and Rest Periods ...................................36    123-124

    iv. Alleged Inaccurate Wage Statement Penalties .........................37       125

V. Conclusion    ........................................................................37    126-127

## I.     INTRODUCTION

1.      My name is Joseph A. Krock, Ph.D. I reside in Palos Verdes Estates, California. I am an economist and Managing Director of The Claro Group, LLC ("Claro"), a multi-disciplinary consulting firm with offices in Austin, Chicago, Houston, Los Angeles, and Washington, D.C. My office is located in Los Angeles, California.

2.      I earned Master and Doctorate Degrees in Economics from the University of Chicago, and I earned a Bachelor of Arts Degree in Economics-Mathematics from the University of California, Santa Barbara. I have extensive training in statistical and econometric methods at both the undergraduate and graduate level. I have served as a lecturer in Economic Theory at the University of Chicago, and I regularly speak before professional groups regarding, among other topics, the use of sampling and statistics in litigation, database management and analysis, and damages calculation.

3.      I lead the Economic Consulting Practice at Claro, and I have been retained in connection with various types of employment litigation including wage and hour class and collective actions, discrimination, breach of contract, wrongful termination, personal injury and wrongful death matters, and employment cases in which class certification and economic damages were at issue. Prior to joining Claro, I worked for Micronomics, Inc. and Deloitte & Touche, LLC performing similar duties as I am for Claro.

4.      I have been designated as an expert witness and testified at trial and in deposition as an expert witness in several cases in state and federal district courts in California, Florida, Illinois, Louisiana, Minnesota, Nevada, New Jersey, and Oregon, including Federal Multi-District Litigation ("MDL") matters. I have been retained as an expert in approximately 100 cases in state and federal courts in California, Florida, Illinois, Louisiana, Minnesota, Nevada, New Jersey, New York, Oregon, and Wisconsin.

5.      My curriculum vitae, including a list of all publications I authored in the previous 10 years and a list of all other cases in which I have testified as an expert at trial or by deposition in the last ten years is attached at Exhibit 1. Claro is being compensated for my time at a rate of

$475 per hour. I have been assisted by members of my staff whose rates may range from $150 to $500 per hour. My compensation is not dependent on the outcome of this litigation.

6.      For the purposes of my assignment and analysis, I have reviewed the *FIRST AMENDED CLASS ACTION COMPLAINT*, the depositions for each of the five Plaintiffs, the depositions of other witnesses, a variety of sales data and summaries, as well as tax returns produced by the Plaintiffs. A full list of the documents provided to me by Counsel for Defendants (herein, "Flowers"[1]) is attached at Exhibit 2.

## II.    ASSIGNMENT

7.      I was asked by counsel for Flowers to review certain information regarding the five Plaintiffs in this matter, including sales and expense records, deposition testimony, distributor agreements, etc. After reviewing that information, I was asked to provide a series of calculations which would represent potential damages to each plaintiff given a varying set of assumptions.

8.      Specifically, I was asked to review and calculate the value of the territories owned by each plaintiff to determine whether the ownership of a territory is an asset from which each plaintiff could gain or lose value based on the performance of each territory. I also was asked to review and calculate the expenses that have been claimed to determine the amount of potential unpaid business expenses, if the plaintiffs are found to be employees and not independent contractors. Finally, I was asked to calculate potential unpaid meal and rest period penalties.

9.      As discovery is ongoing, the calculations I have made to date include assumptions based on available materials. I understand that discovery is being sought to validate or adjust these assumptions. I reserve the right to update my calculations as this information becomes available.

---

[1] I understand that four Defendants have been named in this suit, Flowers Foods, Inc., Flowers Baking Co. of California, Flowers Baking Co. of Henderson, and Flowers Bakeries Brands, Inc. I use "Flowers" in my report as shorthand without reference to the specific legal entities. I do not have an opinion as to the legal relationships between or among these entities.

III.    **SUMMARY OF CONCLUSIONS**

10.     I have arrived at three general conclusions which apply to all Plaintiffs in this matter:

1)  The distribution rights for Flowers' products in a geographic market and the ability to transfer those rights create an economic asset which is held by all Plaintiffs;

2)  Based on various valuation methodologies, it is very likely that Plaintiffs could sell the rights to their territories for an amount in excess of what was originally paid – at least one Plaintiff sold a portion of his territory and profited from that sale;[2] and

3)  An analysis of each Plaintiff's owner-operated territory shows that all Plaintiffs earned in excess of $14 per hour, and four earned in excess of $20 per hour.[3]

11.     Additionally, I understand that this action depends on a determination of whether these Plaintiffs are determined to be independent contractors. If Plaintiffs are determined to be correctly classified as independent contractors, damages in this case are $0. If it is determined that Plaintiffs were misclassified as independent contractors, damages will depend on additional findings made by the trier of fact and/or law. The calculations presented below provide a range of potential damages.

IV.    **DISCUSSION**

A.    **Jose Almendariz**

i.    **Territory Valuation – Territories 6758 & 6768**

12.     According to the Financial Accounting Standards Board ("FASB"), assets are, "probable future economic benefits obtained or controlled by a particular entity as a result of past

---

[2] This valuation assumes a continuing independent contractor model. A finding of employment status would render these territories valueless.

[3] Such earnings do not reflect compensation paid by Flowers, but are an extrapolation from profits less business expenses, as discussed below.

transactions or events."[4] In other words, an asset is an economic resource which provides current and potential future benefits (including cash payments) to its owner. One characteristic of an asset is that it can be transferred from one owner to another.

13.     Jose Almendariz, through his corporation, Almendariz, Inc., entered into two Distributor Agreements. The first Distributor Agreement, signed on April 12, 2013,[5] transferred to Mr. Almendariz from Flowers Baking Co. of California, LLC the distribution rights for Flowers' products in Territory 6758, located in South Los Angeles, roughly in the area around the University of Southern California. Almendariz, Inc. agreed to pay $70,525 for those rights. The second Distributor Agreement, also signed on April 12, 2013,[6] transferred to Mr. Almendariz from Flowers Baking Co. of California, LLC the distribution rights for Flowers' products in the Inglewood territory, Territory 6768, which roughly includes the area immediately East of Los Angeles International Airport. Almendariz, Inc. agreed to pay $74,213 for those rights.

14.     Item 3.1 in the Distributor Agreement allows the Distributor, Jose Almendariz, to transfer, assign or sell the ownership of the distribution rights for his territories.[7] From an economic perspective, this arrangement creates an asset – the territorial distribution rights for products. This asset may increase or decrease in value over time depending on internal efforts by Mr. Almendariz or factors outside of his control, and Mr. Almendariz may sell these territories to anyone who is willing to accept his asking price.

15.     The purchase value of the territories is based on a formula which is identified in the Territory Pro Forma. The formula for Territories 6758 and 6768 values non-Sara Lee sales at 13 times average weekly non-Sara Lee sales and Sara Lee sales at eight times average weekly Sara Lee sales. Average weekly non-Sara Lee sales were $1,719, implying a value of $22,349.

---

[4] FASB, *Statement of Financial Accounting Concepts No. 6*, ¶25, (http://www.fasb.org/pdf/aop_CON6.pdf).
[5] *FLOWERS BAKING CO. OF CALIFORNIA, LLC, DISTRIBUTOR AGREEMENT*, p. 19, (PAlmendariz000010-48).
[6] *FLOWERS BAKING CO. OF CALIFORNIA, LLC, DISTRIBUTOR AGREEMENT*, p. 19, (PAlmendariz000086-124).
[7] *FLOWERS BAKING CO. OF CALIFORNIA, LLC, DISTRIBUTOR AGREEMENT*, p. 3, (PAlmendariz000010-48).

Average weekly Sara Lee sales were $6,022, implying a value of $48,176. Total value for the territory was $70,525.[8] Similarly, the value for Territory 6768 was determined using the same formula, which results in a valuation of $74,213.[9]

16.     Item 3.1(b) in the Distribution Agreements includes valuation language which provides a value of "thirteen (13) times the average weekly sales volume of Products and Authorized Products in the territory calculated over the six (6) month period preceding."[10] Without the differential between Sara Lee and non-Sara Lee food, the valuations would be $100,633 for Territory 6758 and $101,543 for Territory 6768.

17.     Two methods for calculating the value of an asset include relative valuation techniques (i.e., ratio analysis – as shown above) and discounted cash flow techniques.[11] Flowers has chosen a standard ratio technique for valuing the territorial distribution rights – a multiple of gross sales. As indicated by Mr. Almendariz's agreement to pay the purchase price, the valuation determined by Flowers is a fair valuation, i.e., Mr. Almendariz valued the distribution rights to be worth at least as much as Flowers' asking price. To determine the current value of these two assets purchased by Mr. Almendariz, I employ both relative valuation techniques and discounted cash flow analysis. For the relative analyses, I calculate the valuation of the territories based on the formula provided by Flowers. I also researched the market value of territories, as identified by a route broker. For the discounted cash flow ("DCF") method, I provide a range of results based on various assumptions.

### a.     Relative Valuation – Ratio Analysis

18.     The basis for the relative calculation, as specified by Flowers, is average weekly gross sales for the most recent six months. I have calculated the average weekly sales for Territories 6758 and 6768 for the most recent six months. Territory 6758 averaged sales of $7,267.04 which implies a valuation of $94,471.50, at 13 times average weekly revenue. This

---

[8] *TERRITORY PROFORMA, TERRITORY 6758* (PAlmendariz000050).
[9] *TERRITORY PROFORMA, TERRITORY 6768*, (PAlmendariz000126).
[10] *FLOWERS BAKING CO. OF CALIFORNIA, LLC, DISTRIBUTOR AGREEMENT*, p. 3, (PAlmendariz000053-85).
[11] Reilly & Brown, *Investment Analysis and Portfolio Management, Sixth Edition*, p.446.

represents an increase in value of this territory of over 34.0 percent or a compound annualized growth rate of 10.1 percent. Territory 6768 averaged sales of $8,531.79, which implies a valuation of $110,913.21. This represents an increase in value of this territory of 49.5 percent or a compound annualized growth rate of 14.1 percent. If Mr. Almendariz were to sell his distribution rights based on this relative valuation for both territories, he would gain $60,647 in profit from his investment – above any profits already collected by Mr. Almendariz.

19. As a comparison, an investment of $70,525 in the S&P 500 on April 15, 2013 would have increased in value to $92,670 as of April 25, 2016, an increase of 31.5 percent or a compound annual growth rate of 9.4 percent.[12] Other potential investments include purchasing government treasuries, certificates of deposit ("CDs"), or simple savings accounts. U.S. Treasuries have consistently returned less than one percent annually for maturities less than five years.[13] Similarly, CDs and savings accounts have offered returns of between zero and two percent annually depending on the length of the investment.[14]

20. Mr. Almendariz's investment in the distribution rights has met market returns for Territory 6758 and exceeded market returns by nearly four percent per year for Territory 6768. In addition to the asset appreciation for both territories, Mr. Almendariz earned profits for his ownership rights. I have estimated the value of those profits (my discussion of the calculation of those profits is in Section IV.A.ii.c. of this report) to be approximately $373,251.[15]

21. An alternative relative valuation would be to look at the open market prices for territories with Flowers. I identified a number of territories in California and outside of California which were listed for sale on RoutesforSale.net. Exhibit 3 displays the asking prices, gross revenue and profits for these territories. It also calculates the Gross Weekly Revenue Ratio (analogous to the 13 times number found above) for these territories. On the low end, the asking

---

[12] The S&P 500 index was 1,588.85 on April 12, 2013 and 2,087.79 on April 25, 2016.
[13] The Wall Street Journal, U.S. Treasury Quotes, Treasury Notes & Bonds, April 12, 2013 (http://online.wsj.com/mdc/public/page/2_3020-treasury-20130412.html?mod=mdc_pastcalendar).
[14] Historical CD and Savings rates are not available. Current rates have not changed significantly since 2008. Current rates can be found here: http://online.wsj.com/mdc/public/page/2_3021-bankrate.html?mod=topnav_2_3020.
[15] I calculated this as $249,403 in profits from Territory 6768 and $123,848 in profits from Territory 6758.

prices are approximately nine times the Gross Weekly Revenue, while, on the high end, the asking prices are over 19 times the Gross Weekly Revenue. As shown in Exhibit 4, applying the average ratio of 15.4, the valuation of Territory 6758 would be $111,912 and the valuation of Territory 6768 would be $131,389. These valuations represent compound annual growth rates of 16.4 percent and 20.7 percent, respectively. Gross profits from selling these territories at the average ratio would total $98,564.

22.     Two of the territories listed for sale are located in California. Those territories are more comparable to Mr. Almendariz's territories. Both are listed for multiples over 19, with an average of 19.2. The valuation of both territories based on a ratio of 19.2 yields $139,527 for Territory 6758 and $163,810 for Territory 6768. These values represent gross profits of $158,599, i.e., more than double his initial investment if Mr. Almendariz were able to command this multiple.

### b.     Discounted Cash Flow Analysis

23.     The second valuation methodology uses discounted cash flows to determine the value of an asset. Section IV.A.ii.c. describes the method with which I calculated the cash flows to Mr. Almendariz. Usually, owners of an asset do not deduct owner-labor from the calculation of cash flow. As these territories are typically run by owner-operators, I have valued both territories at the pre-labor cash flow. The decision of an owner to hire help, as Mr. Almendariz has done for Territory 6758, is a business decision. He could have avoided that labor cost by using his own labor to service it.

24.     Net average weekly cash flow for Territory 6758 was $1,567.70, or $81,520.37 annually. Net average weekly cash flow to Territory 6768, excluding owner-labor, totals $1,578.50, or $82,082.15 annually. The next step of a DCF analysis contemplates potential growth of the revenue stream and discount factors. A review of the weekly cash flow indicates growth of zero would be appropriate for this territory. Discounts should be applied for 1) inflation and 2) business risks. Long-term inflation estimates range from one percent to three percent. The implied 30-year inflation rate from an analysis of the spread between 30-year

Treasuries and 30-year Treasury Inflation Protected Securities (TIPS) is approximately 1.8 percent.[16] Conservatively, I assume an inflation rate of three percent.

25.      Business risk is difficult to measure. It is meant to capture the risk of the revenue stream evaporating at some point in the future. There are no indicators that Flowers will be ceasing its operation in the near term. Research suggests an average Weighted Cost of Capital for the transportation sector to be approximately nine percent.[17]

26.      For perspective, an investor using a discount rate of ten percent would expect a full return of an investment within eight years, with the expectation that the stream of cash flows will continue after the investment is returned. An investor using a discount rate of 25 percent would expect a full return of an investment within four years. An investor using a discount rate of 50 percent would expect a full return of an investment within two years.

27.      I have prepared valuations based on a range of risk assumptions and have attached them at Exhibit 5. A ten percent risk premium (plus three percent inflation) indicates valuations of $627,080 for Territory 6758 and $631,401 for Territory 6768. A 25 percent risk premium indicates valuations of $291,144 and $293,151, respectively. The public valuations at the average ratio of 15.4 indicate risk premiums of approximately 69.8 percent, and 59.5 percent. The public valuations at the California average ratio of 19.2 indicate risk premiums of approximately 55.4 percent and 47.1 percent. Flowers valuation at 13 times weekly average sales indicates risk premiums of 83.3 percent and 71.0 percent.

28.      These risk premiums indicate the expectation of a full return of an investment within two years (1.2 years for a discount rate of 83.3 percent). In other words, a weekly cash flow of $1,567.70 ($81,520.37 annually) will only take 1.2 years to cover the initial investment

---

[16] The 30-Year TIPS yield as of April 25, 2016 is 0.934 percent (http://www.wsj.com/mdc/public/page/2_3020-tips-20160425.html?mod=mdc_pastcalendar). The 30-year Treasury yield as of April 25, 2016 is 2.723 percent (http://www.wsj.com/mdc/public/page/2_3020-treasury-20160425.html?mod=mdc_pastcalendar). These indicate a long term inflation expectation of approximately 1.8 percent.
[17] Cost of Capital by Sector (US), Transportation Sector, WACC is 8.69 percent (http://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/wacc.htm).

of $94,471.50. The decision of financing and/or owner-operating the territories is an individualized decision separate from the valuation.

29.     These valuation estimates provide support for the conclusion that Mr. Almendariz's territories have increased in value over time. He is free to sell these assets whenever he chooses. If he were to sell them today, he likely would profit in a substantial manner, in excess of $60,000 above his initial investment.

      ii.    **Business Expenses**

      a.    **Alleged Unreimbursed Business Expenses**

30.     I have reviewed the Distributor Summary Reports for Mr. Almendariz from April 2013 through April 2016. I also have reviewed the Responses to Interrogatories completed by Mr. Almendariz (or his counsel). Additionally, I reviewed the deposition testimony of Mr. Almendariz provided on December 16, 2015, as well as Mr. Almendariz's tax documents for 2013-2015.

31.     Using these sources of information, I have calculated the amount of business expenses which he claims are unreimbursed. The categories of expenses he claims are: 1) vehicle-related expenses, 2) administrative fees, 3) handheld equipment expenses, 4) warehouse rent, 5) shrink, 6) stale adjustment, 7) cell phone, and 8) depreciation.[18] Mr. Almendariz has not provided an estimate of the depreciation expense to date. I will address his claims for depreciation when that information is provided.

32.     I have attached a table summarizing the expenses claimed by Mr. Almendariz as Exhibit 6. This table displays the amounts either identified in source documents, business records, or his testimony. I have calculated total expenses for all of these categories and have compared those amounts to his claims in his interrogatory responses.

33.     A comparison between my estimates and Mr. Almendariz's interrogatory responses shows that Mr. Almendariz's claims for administrative fees, handheld equipment fees,

---

[18] *PLAINTIFF JOSE ALMENDARIZ'S RESPONSE TO DEFENDANT FLOWERS BAKING CO. OF HENDERSON'S INTERROGATORIES, SET TWO,* April 21, 2016, Response to Interrogatory No. 11.

warehouse rent, and stale adjustments are consistent with the amounts I identified in his Distributor Summary Reports (small differences do exist, though). Mr. Almendariz's claims for vehicle expenses, shrink charges, and phone bills are larger than the amounts he identified in his deposition or business plan. No supporting documentation was provided to substantiate these amounts.

34.     Mr. Almendariz is claiming an additional $9,497.44 (approximately $60 per week) in vehicle expenses above his claims made in either his deposition testimony or business plan. The source of this discrepancy is unclear as no supporting documentation was provided. He also claims an additional $1,263.68 in shrink charges despite the fact that his Distributor Summary Reports reflect only $257.62 in shrink charges. Total shrink charges for his route are only $928.14, however most of these charges were ultimately reversed. Finally, Mr. Almendariz claims an additional $556.18 (approximately $3.50 per week) in phone expenses. No support was provided for these phone expenses.

35.     Based on the testimony and documents provided by Mr. Almendariz, if he is found to be an employee, his unreimbursed business expenses total $31,966. If, however, the unsupported claims made in his interrogatory responses are used, his unreimbursed business expenses total $43,083.[19]

36.     Additionally, based on my review of tax documents provided by Mr. Almendariz, he has already claimed at least a portion of these business expenses as deductions, and thus, has already received a tax benefit. As such, Mr. Almendariz would not be entitled to complete reimbursement of business expenses. This, ultimately, would reduce his purported damages.

### b.     Alleged "Unlawful Deductions"

37.     Mr. Almendariz also makes a claim for alleged "unlawful deductions" in his interrogatory responses in the amount of $9,758.[20] After reviewing his records, I have calculated this amount to be $8,694. It is important to note that Mr. Almendariz should not be compensated

---

[19] *Ibid*, Response to Interrogatory No. 11.
[20] *Ibid*, Response to Interrogatory No. 13.

for both unpaid business expenses and "unlawful deductions." These deductions are duplicative of the amounts identified in his unreimbursed business expenses. If compensated for these amounts, he should receive one or the other.

### c.     Net Profits

38.     In order to calculate the profit stream for the territories, I used the information from Mr. Almendariz's Distributor Summary Reports to supply "Pre-Reconciliation pay," or the amount from Mr. Almendariz's sales which accrues to him before expenses are paid. "Post-Reconciliation pay" represents the profit that Mr. Almendariz would have taken home at the end of the week. To calculate the Post-Reconciliation pay, I used the actual amounts deducted from Mr. Almendariz's Pre-Reconciliation Pay which appear in his Distributor Summary Reports. Those amounts include the same items which Mr. Almendariz identifies in his unreimbursed expense claim, e.g., administrative fees, handheld equipment fees, warehouse rent, etc. Additionally, I removed vehicle expenses and phone expenses from his Pre-Reconciliation pay.

39.     Exhibits 7 and 8 show the calculation of Post-Reconciliation pay for Territories 6768 and 6758, respectively. Mr. Almendariz earned $249,403 in profits, or $1,578.50 per week from Territory 6768. For Territory 6758, he earned $247,697 in profits, but testified that he split those profits 50/50 with Mr. Marin.[21] In other words, he would have received $123,848 in net profits from Territory 6758. In total, during the time he owned these two territories, Mr. Almendariz earned $373,251 in profits.

40.     I was also asked to calculate the net profits if the Court finds Mr. Almendariz's expense claims are credible, i.e., his claimed expenses of $43,083 are accepted. The profits for Territory 6768 would be $238,286, $11,117 less than his profits using the expenses that I estimated. The profits for Territory 6758 would be the same, because Mr. Almendariz does not claim any expenses for that territory. Total profits would be $362,134.

---

[21] A summary of the actual and estimated non-labor expenses for Territory 6758 is included as the last page of Exhibit 8.

### d.    Hourly Rate

41.    I was asked by counsel to make two calculations regarding the effective hourly rate earned by Mr. Almendariz. I was asked to calculate a net effective hourly rate, assuming expenses are deducted from earnings and that Mr. Almendariz worked the schedule that he testified to in his deposition, i.e., 60 hours per week.[22] If the hours claimed by Mr. Almendariz are determined to be not credible, the hourly rates may change. A reduction in hours worked would increase his effective hourly rate.

42.    Additionally, this calculation does not include profits earned by Mr. Almendariz on the territory he did not service. I have deducted the expenses found in his Distributor Summary Reports and expenses I estimated using his testimony to identify his net pay. Exhibit 9 shows the calculation of Post-Reconciliation pay for Mr. Almendariz from April 2013 through April 2016 for Territory 6768. For this period, his average effective hourly wage is $26.31. On a weekly basis, he earned an effective hourly rate as high as $39.72 and as low as $11.12. If the earnings[23] from Territory 6758 are included in Mr. Almendariz's Post-Reconciliation pay, then the average effective hourly wage for this period is $39.37.

43.    I was also asked to calculate his average hourly wage if his expenses are deemed to be credible. To calculate this wage, I divided his total profits using his claimed expenses, $238,286, by his estimated hours worked, 9,480. Mr. Almendariz's average hourly wage would be $25.14. Again, if the earnings from Territory 6758 are included in Mr. Almendariz's post-reconciliation pay, then the average hourly wage would be $38.20.

44.    Alternatively, I was asked to calculate the effective hourly rate for Mr. Almendariz if the expenses were fully reimbursed, i.e., Mr. Almendariz is deemed to be an employee and expenses are reimbursed. Under that assumption, the average effective hourly rate

---

[22] Mr. Almendariz testified to working five days a week for between 10 and 12 hours at *DEPOSITION OF JOSE ALMENDARIZ*, December 16, 2015, 169:8-17. Mr. Almendariz also claimed that he worked one day a week for less than 5 hours at *PLAINTIFF JOSE ALMENDARIZ'S RESPONSE TO DEFENDANT FLOWERS BAKING CO. OF HENDERSON'S INTERROGATORIES, SET TWO*, April 21, 2016, Response to Interrogatories No. 15-18.
[23] As discussed earlier, Mr. Almendariz testified that he split profits (Post-Reconciliation pay) from Territory 6758 50/50 with Mr. Marin.

for Mr. Almendariz would be $29.68. On a weekly basis, Mr. Almendariz would have earned an effective hourly rate as high as $43.44 and as low as $15.80. If I include earnings from Territory 6758,[24] the average effective hourly rate would be $44.44.

45.     To provide context to these wage calculations, I was asked to research the average and median wages for employees in related industries. I accessed the Labor Market Information Division ("LMID") of the Employee Development Department for the State of California. The LMID tracks wages, and many other labor market characteristics, for numerous occupations across California. The LMID reports those statistics in its Labor Market Data Library[25] for geographies as small as the metropolitan division level, a smaller subset of a Metropolitan Statistical Area ("MSA"). For the purposes of this analysis, I have determined that the "Los Angeles-Long Beach-Glendale, CA Metropolitan Division" is the relevant area for reporting comparable wages for the territories located in the Los Angeles area. I also determined that the "San Diego-Carlsbad-San Marcos, CA Metropolitan Division" is the relevant area for reporting comparable wages for the territories located in the San Diego area.

46.     The LMID provides statistics for numerous groups of transportation-related occupations. My review of these groups indicates that the appropriate occupational code for workers in the same general occupation as the Plaintiffs would be "SOC 53-3031 – Driver/Sales Workers."[26] Exhibit 10 displays the mean, 25th percentile, median, and 75th percentile for employee drivers engaged in work similar to Plaintiffs. Overall, "average" wages fall in the range of $11.12 to $14.90 in the Los Angeles area. It also shows that the "average" wages for the San Diego area fall in the range of $13.13 to $15.85.

47.     Mr. Almendariz's wages, net or gross of expenses, far exceed industry average rates for employee delivery drivers in the Los Angeles area.

---

[24] These earnings would equal Pre-Reconciliation pay divided by two (due to the 50/50 split with Mr. Marin).
[25] This information can be accessed at: http://www.labormarketinfo.edd.ca.gov/data/labor-market-data-library.html.
[26] According to the U.S. Bureau of Labor Statistics, the definition of Standard Occupational Classification ("SOC") 53-3031 – Driver/Sales Worker is: "Drive truck or other vehicle over established routes or within an established territory and sell or deliver goods, such as food products, including restaurant take-out items, or pick up or deliver items such as commercial laundry. May also take orders, collect payment, or stock merchandise at point of delivery. Includes newspaper delivery drivers." (http://www.bls.gov/soc/2010/soc533031.htm).

### iii.   Alleged Missed Meal and Rest Periods

48.     Using the actual weekly effective regular rates and assumptions regarding the frequency of missed meal and rest periods, I have calculated the potential missed meal and rest period penalties through April 23, 2016, as shown in Exhibit 11. From his interrogatory responses, Mr. Almendariz claims to have received zero 30-minute meal periods during his entire time with Flowers.[27] Assuming he worked five days of more than five hours per week, and took nine weeks of vacation,[28] I have estimated the alleged amount of missed meal penalties to be $19,600.

49.     Mr. Almendariz also claims to have received zero 10-minute periods during his time with Flowers. He also claims that he worked six days of more than 3 ½ hours per week.[29] Assuming he worked six days of more than 3 ½ hours per week with nine weeks of vacation, I have estimated the amount of rest period penalties to be $23,520.

50.     I have been asked to provide a calculation of penalties under a set of assumptions if Mr. Almendariz's claims are determined to be unpersuasive. I have assumed six scenarios for Mr. Almendariz depending on whether there is a finding that he was provided compliant meal and rest periods: 1) 0 percent of the time, 2) 20 percent of the time, 3) 40 percent of the time, 4) 60 percent of the time, 5) 80 percent of the time, and 6) 100 percent of the time. Exhibit 12 shows the range of outcomes for meal and rest period penalties. The range of meal period penalties is $0 to $19,600, while the range of rest period penalties is $0 to $23,520. Mr. Almendariz claims $20,627 and $25,442 in missed meal and rest period penalties through April 9, 2016. He does not state the wage used in these calculations.

### iv.   Alleged Inaccurate Wage Statement Penalties

51.     In addition to meal and rest period penalties, Mr. Almendariz claims that he should receive $4,000 in inaccurate wage statement penalties.[30] If he is determined to be an

---

[27]   *PLAINTIFF JOSE ALMENDARIZ'S RESPONSE TO DEFENDANT FLOWERS BAKING CO. OF HENDERSON'S INTERROGATORIES, SET TWO*, April 21, 2016, Response to Interrogatory No. 16.
[28]   *Ibid.*
[29]   *Ibid*, Response to Interrogatory No. 18.
[30]   *Ibid*, Response to Interrogatory No. 21.

employee, the determination of inaccurate wage statement penalties is a statutory matter which would be calculated by the finder of fact or law.

**B.      James King**

52.     The methodologies used to calculate potential damages for the remaining plaintiffs are identical to that used for Mr. Almendariz. I will identify unique information below and present the results in a more condensed manner.

**i.      Territory Valuation – Territory 6472**

53.     James King, as an individual, entered into one Distributor Agreement. The Distributor Agreement, signed on April 15, 2013,[31] transferred to Mr. King from Flowers Baking Co. of California, LLC the distribution rights for Flowers' products in Territory 6472, located east of Chula Vista, CA (San Diego County), in Otay Ranch.[32] Mr. King agreed to pay $165,944 for those rights. The valuation of Territory 6472 was based on $6,065 in weekly Non-Sara Lee sales and $6,700 in weekly Sara Lee sales. Both revenue streams were valued at 13 times weekly sales.[33]

**a.      Relative Valuation – Ratio Analysis**

54.     Mr. King's average weekly revenue for the most recent six months is $11,756. The valuation of this territory based on a ratio of 13 would total $152,827. This represents a decrease in value of 7.9 percent or a compound annual growth rate of negative 2.7 percent per year. Using the average ratio of 15.4, the value of the territory would be $181,041, a compound annual growth rate of 2.9 percent. Using the California average ratio of 19.2, the value of the territory would be $225,713, a compound annual growth rate of 10.7 percent. Exhibit 13 presents these calculations. Additionally, Mr. King received net profits of $400,589 from April 2013 through April 2016.

---

[31] *FLOWERS BAKING CO. OF CALIFORNIA, LLC, DISTRIBUTOR AGREEMENT*, p. 23, (JKING-000054---JKING-000102).
[32] Mr. King later incorporated, with his entity becoming the responsible entity (FLO-MAR0000242-0000243).
[33] *TERRITORY PRO FORMA,TERRITORY 6472*, (FLO-MAR0000285).

### b.    Discounted Cash Flow Analysis

55.    For the DCF method, I have calculated average weekly cash flow to be $2,523.37. With a ten percent discount rate (plus three percent inflation), Territory 6472 would be valued at $1,014,149. With a 25 percent discount rate, Territory 6472 would be valued at $470,855. The implied discount rate given the Flowers valuation is 83.3 percent; the average market valuation implied discount rate is 69.8 percent; and the California average market valuation implied discount rate is 55.4 percent. Exhibit 14 presents these calculations.

56.    Selling Territory 6472 on the open market would likely lead to a profit of more than $15,000, not including profits already collected by Mr. King.

### ii.    Business Expenses

### a.    Alleged Unreimbursed Business Expenses

57.    Mr. King also alleges similar unreimbursed business expenses, namely: 1) vehicle-related expenses, 2) administrative fees, 3) handheld equipment expense, 4) warehouse rent, 5) shrink, 6) cell phone, and 7) depreciation.[34] Mr. King has not provided an estimate of the depreciation expense to date. I will address his claims for depreciation when that information is provided.

58.    I have attached a table summarizing the expenses claimed by Mr. King as Exhibit 15. This table displays the amounts either identified in source documents, business records, tax documents, or his testimony. I have calculated the total expenses for the categories above and compared those amounts to the claims in his interrogatory responses.

59.    A comparison between my estimates and Mr. King's interrogatory responses show that Mr. King's claims for administration fees, handheld equipment fees, warehouse rent, and shrink charges are consistent with the amounts I identified in his Distributor Summary Reports. My estimates are higher than his primarily because I used Distributor Summary Reports through April 23, 2016.

---

[34] *PLAINTIFF JAMES KING'S RESPONSE TO DEFENDANT FLOWERS BAKING CO. OF HENDERSON'S INTERROGATORIES, SET TWO*, April 21, 2016, Response to Interrogatory No. 11.

60.     Mr. King's claims for vehicle expenses are larger than the amounts he identified in his deposition or business plan. No supporting documentation was provided to substantiate these amounts. Mr. King is claiming an additional $13,704 (approximately $87 per week) in vehicle expenses above his claims made in his deposition. The source of this discrepancy is unclear as no supporting documentation was provided. Furthermore, a review of his tax returns shows that he claimed $23,659 in vehicle expenses during the relevant time period.[35] In other words, Mr. King claimed $5,331 less in expenses on his tax returns than he claims in his interrogatory responses. I would expect that he would have claimed at least as much on his tax returns as he claims in this matter.

61.     Based on the testimony and documents provided by Mr. King, if he is found to be an employee, his unreimbursed business expenses total $27,728. If, however, the unsupported claims made in his interrogatories are used, his unreimbursed business expenses total $40,904.[36]

62.     Additionally, based on my review of tax documents provided by Mr. King, he has already claimed at least a portion of these business expenses as deductions, and thus, has already received a tax benefit. As such, Mr. King would not be entitled to complete reimbursement of business expenses. This, ultimately, would reduce his purported damages.

**b.     Alleged "Unlawful Deductions"**

63.     Similar to Mr. Almendariz, Mr. King makes a claim for alleged unlawful deductions in his interrogatory responses in the amount of $9,325.[37] After reviewing his records, I have calculated this amount to be $9,707. These deductions are duplicative of the amounts identified in his unreimbursed business expenses. If compensated for these amounts, he should receive one or the other.

---

[35] JKING012789-012790.
[36] *Ibid*, Response to Interrogatory No. 11.
[37] *Ibid*, Response to Interrogatory No. 13.

### c.   Net Profits

64.     As I did with Mr. Almendariz, I reviewed Mr. King's Distributor Summary Reports to determine his Pre-Reconciliation pay. I also identified the costs contained in the Distributor Summary Reports, as well as other expenses claimed by Mr. King. I calculated his Post-Reconciliation pay, which is equivalent to his profits. His total Pre-Reconciliation pay was $428,317. His total Post-Reconciliation pay, or profit, was $400,589, or $2,535 per week. Exhibit 16 presents the detailed calculations. If it is determined that his claimed expenses are credible, his profits would be reduced by the additional $13,175 in expenses he claims in his interrogatory response. In that case, Mr. King's net profits would be $387,413.

### d.   Hourly Rate

65.     I also calculated the effective hourly rate earned by Mr. King. I was asked to calculate a net effective hourly rate, assuming expenses are deducted from earnings and that Mr. King worked the schedule that he testified to in his deposition.[38] If the hours claimed by Mr. King are determined to be not credible, the hourly rates may change. A reduction in hours worked would increase his effective hourly rate. For the period April 2013 through April 2016, his average hourly wage is $56.05. On a weekly basis, he earned an effective hourly rate as high as $83.46 and as low as $32.27.

66.     Alternatively, I was asked to calculate the effective hourly rate for Mr. King if the expenses were fully reimbursed, i.e., Mr. King is deemed to be an employee and expenses are reimbursed. Under that assumption, the average effective hourly rate for Mr. King would be $59.93. On a weekly basis, Mr. King would have earned an effective hourly rate as high as $87.00 and as low as $38.45. Exhibit 17 shows the effective hourly rates on a weekly and overall basis.

67.     Mr. King's wages, net or gross of expenses, far exceed industry average rates for employee delivery drivers in the San Diego area.

---

[38] *DEPOSITION OF JAMES KING*, December 16, 2015, 118:23-122:14.

### iii.    Alleged Missed Meal and Rest Periods

68.    I calculated missed meal and rest period penalties using Mr. King's weekly effective hourly rate through April 23, 2016, as shown in Exhibit 18. From his interrogatory responses, Mr. King claims to miss five rest periods per week and five meal periods per week.[39] He also claims to have taken four weeks of vacation. Assuming he missed five meal periods and five rest periods per week with four weeks of vacation, I have estimated his alleged missed meal penalties to be $37,661 and his alleged missed rest penalties to be $37,661. Mr. King claims in his interrogatory responses that he should receive $35,024 for meal period penalties and $35,024 for rest period penalties.[40]

69.    I have provided a table at Exhibit 19 which displays six scenarios if Mr. King is determined to be an employee and his claims of five missed meal and five missed rest periods is unpersuasive. The range of both missed meal and rest period penalties is $0 to $43,150.

### iv.    Alleged Inaccurate Wage Statement Penalties

70.    In addition to meal and rest period penalties, Mr. King claims he should receive $4,000 in inaccurate wage statements penalties.[41] If he is determined to be an employee, the determination of inaccurate wage statement penalties is a statutory matter which would be calculated by the finder of fact or law.

### C.    Humberto Lopez

### i.    Territory Valuation – Territories 6542

71.    Humberto Lopez, as an individual, entered into one Distributor Agreement. The Distributor Agreement, signed on June 24, 2013,[42] transferred to Mr. Lopez from Flowers Baking Co. of California, LLC the distribution rights for Flowers' products in Territory 6542, located in the San Diego areas of Lake Murray and Grossmont. Mr. Lopez agreed to pay

---

[39] *PLAINTIFF JAMES KING'S RESPONSE TO DEFENDANT FLOWERS BAKING CO. OF HENDERSON'S INTERROGATORIES, SET TWO*, April 21, 2016, Response to Interrogatory No. 15.
[40] *Ibid*, Response to Interrogatory No. 21.
[41] *Ibid*, Response to Interrogatory No. 21.
[42] *FLOWERS BAKING CO. OF CALIFORNIA, LLC, DISTRIBUTOR AGREEMENT*, p. 19, (FLO-MAR0000306---FLO-MAR0000338).

$104,468 for those rights. The valuation of Territory 6542 was based on $8,036 in weekly sales at 13 times weekly sales.[43]

### a.   Relative Valuation – Ratio Analysis

72.     Mr. Lopez's average weekly revenue for the most recent six months is $7,412. The valuation of this territory based on a ratio of 13 would total $96,361. This represents a decrease in value of 7.8 percent or a compound annual growth rate of negative 2.8 percent per year. Using the average ratio of 15.4, the value of the territory would be $114,151, a compound annual growth rate of 3.2 percent. Using the California average ratio of 19.2, the value of the territory would be $142,318, a compound annual growth rate of 11.5 percent. Exhibit 20 presents these calculations.

### b.   Discounted Cash Flow Analysis

73.     For the DCF method, I have calculated average weekly cash flow to be $1,294.17. A Pro Forma statement for Territory 6542, created in July 2013, estimates revenue, expenses and profits.[44] It suggests weekly margin of $1,735. It also estimates his expenses, excluding territory payments and truck lease payments, to be $280 per week. This Pro Forma suggests Mr. Lopez will make approximately $1,455 per week in profit. The estimated profits earned by Mr. Lopez fall within that range.

74.     With a ten percent discount rate (plus three percent inflation), Territory 6542 would be valued at $517,666. With a 25 percent discount rate, Territory 6542 would be valued at $240,345. The implied discount rate given the Flowers valuation is 66.8 percent; the average market valuation implied discount rate is 56.0 percent; and the California average market valuation implied discount rate is 44.3 percent. Exhibit 21 presents these calculations.

75.     Selling Territory 6542 on the open market would likely lead to a profit of almost $10,000, not including profits already collected by Mr. Lopez. A review of Lopez's documents show that he received net profits of $191,537 from June 2013 through April 2016.

---

[43] *TERRITORY PRO FORMA, TERRITORY 6542,* (FLO-MAR0000353).
[44] FLO-MAR0000353-4.

### ii.   Business Expenses

#### a.   Alleged Unreimbursed Business Expenses

76.   Mr. Lopez also alleges similar unreimbursed business expenses, namely: 1) vehicle-related expenses, 2) administrative fees, 3) handheld equipment expense, 4) warehouse rent, 5) shrink, 6) cell phone and 7) depreciation.[45] Mr. Lopez has not provided an estimate of the depreciation expense to date. I will address his claims for depreciation when that information is provided.

77.   I have attached a table summarizing the expenses claimed by Mr. Lopez as Exhibit 22. This table displays the amounts either identified in source documents, business records, tax documents, or his testimony. I have calculated the total expenses for the categories above and compared those amounts to the claims in his interrogatory responses. A comparison shows that Mr. Lopez's claims for administration fees, handheld equipment fees, warehouse rent, and shrink charges are consistent with the amounts I identified in his Distributor Summary Reports.

78.   Mr. Lopez's claims for vehicle expenses and phone bills are larger than the amounts he identified in his deposition or business plan. No supporting documentation was provided to substantiate these amounts. Mr. Lopez is claiming $42,477 in vehicle-related expenses. This is $25,501 more than the amounts he identifies in his business plan and in his Distributor Summary Reports. Furthermore, this claim is 40 percent larger than that of Mr. Almendariz or Mr. King, and only exceeded by Mr. Salazar. A review of his tax returns shows that Mr. Lopez only claimed $21,149 in vehicle expenses during the relevant time period.[46] That is half of the amount he is claiming in this matter. I would expect that he would claim in his taxes at least as much as he is claiming in this matter.

---

[45] *PLAINTIFF HUMBERTO LOPEZ'S RESPONSE TO DEFENDANT FLOWERS BAKING CO. OF HENDERSON'S INTERROGATORIES, SET TWO*, April 21, 2016, Response to Interrogatory No. 11.
[46] HLOPEZ000642-000644.

79.     Based on the testimony and documents provided by Mr. Lopez, if he is found to be an employee, his unreimbursed business expenses total $25,640. If, however, the unsupported claims made in his interrogatories are used, his unreimbursed business expenses total $53,585.[47]

80.     Additionally, based on my review of tax documents provided by Mr. Lopez, he has already claimed at least a portion of these business expenses as deductions, and thus, has already received a tax benefit. As such, Mr. Lopez would not be entitled to complete reimbursement of business expenses. This, ultimately, would reduce his purported damages.

### b.     Alleged "Unlawful Deductions"

81.     Similar to Mr. Almendariz, Mr. Lopez makes a claim for alleged unlawful deductions in his interrogatory responses in the amount of $8,804.[48] After reviewing his records, I have calculated this amount to be $8,664. These deductions are duplicative of the amounts identified in his unreimbursed business expenses. If compensated for these amounts, he should receive one or the other.

### c.     Net Profits

82.     As I did with Mr. Almendariz, I reviewed Mr. Lopez's Distributor Summary Reports to determine his Pre-Reconciliation pay. I also identified the costs contained in the Distributor Summary Reports, as well as other expenses claimed by Mr. Lopez. I calculated his Post-Reconciliation pay, which is equivalent to his profits. His total Pre-Reconciliation pay was $217,302. His total Post-Reconciliation pay, or profit, was $191,537, or $1,294.17 per week. Exhibit 23 presents the detailed calculations. If it is determined that Mr. Lopez's claimed expenses are credible, his profits would be reduced by the additional $27,945 in expenses he claims in his interrogatory response. In that case, Mr. Lopez's net profits would be $163,592.

### d.     Hourly Rate

83.     I also calculated the effective hourly rate earned by Mr. Lopez. I was asked to calculate a net effective hourly rate, assuming expenses are deducted from earnings and that Mr.

---

[47] *Ibid*, Response to Interrogatory No. 11.
[48] *Ibid*, Response to Interrogatory No. 13.

Lopez worked the schedule that he testified to in his deposition.[49] If the hours claimed by Mr. Lopez are determined to be not credible, the hourly rates may change. A reduction in hours worked would increase his effective hourly rate. For the period June 2013 through April 2016, his average effective hourly wage is $14.56. On a weekly basis, he earned an effective hourly rate as high as $24.39 and as low as -$12.20.

84.     Alternatively, I was asked to calculate the effective hourly rate for Mr. Lopez if the expenses were fully reimbursed, i.e., Mr. Lopez is deemed to be an employee and expenses are reimbursed. Under that assumption, the average effective hourly rate for Mr. Lopez would be $16.51. On a weekly basis, Mr. Lopez would have earned an effective hourly rate as high as $26.37 and as low as -$10.21. Exhibit 24 shows the effective hourly rates on a weekly and overall basis.

### iii.     Alleged Missed Meal and Rest Periods

85.     I calculated missed meal and rest period penalties using Mr. Lopez's weekly effective rates through April 23, 2016, as shown in Exhibit 25. From his interrogatory responses, Mr. Lopez claims to miss five meal periods per week and between six and seven rest periods per week.[50] Assuming he missed five meal periods per week and between six and seven rest periods per week, I have estimated his alleged missed meal penalties to be $10,769 and his alleged missed rest penalties to be $13,714. Mr. Lopez claims in his interrogatory responses that he should receive $16,063 for meal period penalties and $20,445 for rest period penalties.[51]

86.     I have provided a table at Exhibit 26 which displays six scenarios if Mr. Lopez is determined to be an employee and his claims of five missed meal and between six and seven missed rest periods are unpersuasive. The range of both missed meal and rest period penalties is $0 to $24,883.

---

[49] *DEPOSITION OF HUMBERTO LOPEZ*, December 18, 2015, 98:21-99:13, 104:24-105:8.
[50] *PLAINTIFF HUMBERTO LOPEZ'S RESPONSE TO DEFENDANT FLOWERS BAKING CO. OF HENDERSON'S INTERROGATORIES, SET TWO*, April 21, 2016, Response to Interrogatory No. 16 & No. 18.
[51] *Ibid*, Response to Interrogatory No. 21.

### iv.    Alleged Inaccurate Wage Statement Penalties

87.    In addition to meal and rest period penalties, Mr. Lopez claims he should receive $4,000 in inaccurate wage statements penalties.[52] If he is determined to be an employee, the determination of inaccurate wage statement penalties is a statutory matter which would be calculated by the finder of fact or law.

### D.    Giovanni Martinez

88.    Mr. Martinez is an example of a territory owner who chose to have his territory wholly serviced by another individual for an extended period, with Mr. Martinez testifying that he did not personally service his route between February 1, 2014 and June 7, 2014.[53] In addition, Mr. Martinez is an example of a territory owner who bought and sold the distribution rights to accounts in his territory.

### i.    Territory Valuation – Territory 6736

89.    Giovanni Martinez, as an individual, entered into one Distributor Agreement. The Distributor Agreement, signed on April 22, 2013,[54] transferred to Mr. Martinez from Flowers Baking Co. of California, LLC the distribution rights for Flowers' products in Territory 6736, located in the area of Long Beach, CA, including the neighborhoods of Los Altos, Eldorado, and Carson Park. Mr. Martinez agreed to pay $113,079 for those rights.[55] The valuation was based on $4,004 in weekly Non-Sara Lee sales and $7,628 in weekly Sara Lee sales. Sara Lee sales were valued at eight times, and Non-Sara Lee sales were valued at 13 times.[56]

90.    In his deposition, Mr. Martinez testified that, "some guys have sold their routes as high as 18 times or 20 times [average weekly revenue]."[57] This statement corroborates the information I identified in the open market sales of Flowers bread territories. The appreciation of

---

[52] *Ibid*, Response to Interrogatory No. 21.
[53] *PLAINTIFF GIOVANNI MARTINEZ'S RESPONSE TO DEFENDANT FLOWERS BAKING CO. OF HENDERSON'S INTERROGATORIES, SET TWO*, April 21, 2016, Response to Interrogatory No. 12.
[54] *Ibid*.
[55] Mr. Martinez later incorporated, with GNA Distributing, Inc. becoming the responsible entity (FLO-MAR0000764-0000765).
[56] *TERRITORY PRO FORMA, TERRITORY 6736*, (FLO-MAR0000827).
[57] *DEPOSITION OF GIOVANNI MARTINEZ*, December 17, 2015, 206:6-21.

the territories as assets is further exemplified by transactions made by Mr. Martinez. He acquired his territory on April 22, 2013,[58] and by October, 2015, he had sold off the distribution rights encompassing two of his accounts, while purchasing the distribution rights to another.

91.     In December, 2013, Mr. Martinez sold the distribution rights for his Vons #2203 account (customer #32841-34) for $11,501.36, based on 13 times average revenue of $884.72.[59] The value of that account in April 2013 was $5,532.98.[60] Mr. Martinez earned a profit of $5,968.38 from this sale. This represents a growth of 107.9 percent. In other words, Mr. Martinez more than doubled his investment in the Vons #2203 account.

92.     In October, 2015, Mr. Martinez sold the distribution rights for his Vons #2209 account (customer #32811-347) for $18,000, based on approximately 15 times average revenue of $1,116.52.[61] The original value of the Vons #2209 account was $7,846.57.[62] Mr. Martinez earned a profit of $10,153.43 from this sale. This represents growth of 129.4 percent (a compound annual growth rate of 61.2 percent). Again, Mr. Martinez more than doubled his investment in his Vons #2209 account. Exhibit 27 presents the calculations I used to determine the profit from these sales. In total, Mr. Martinez profited by $16,121.81.

93.     Also in October, 2013, Mr. Martinez purchased the distribution rights for a Wendys account for $5,798.[63] In the purchase of these distribution rights, he received a discount of 9.5 multiple, which equates to almost instant equity. Overall, Mr. Martinez sold distribution rights for two accounts for a profit of $16,122, and also purchased distribution rights for an account that quickly created equity in his territory.

### a.     Relative Valuation – Ratio Analysis

94.     Because Mr. Martinez sold a portion of his original territory and acquired an additional account, I have adjusted his original territory valuation to account for these changes.

---

[58] *FLOWERS BAKING CO. OF CALIFORNIA, LLC, DISTRIBUTOR AGREEMENT*, p. 19, (FLO-MAR0000768---FLO-MAR0000800).
[59] FLO-MAR0000917.
[60] FLO-MAR0000918 and FLO-MAR0000923.
[61] *DEPOSITION OF GIOVANNI MARTINEZ*, December 17, 2015, 205:25-209:24.
[62] FLO-MAR0000918 and FLO-MAR0000923.
[63] FLO-MAR0000961-964.

The overall original valuate of his territory was $113,079, of which Vons #2203 and #2209 were valued at $5,533 and $7,847, respectively. Mr. Martinez also added a Wendy's account for $5,798 in October 2013. His net original value of the territory as it is currently operating is $105,498.

95.     Mr. Martinez's average weekly revenue for the most recent six months is $12,258. The valuation of this territory based on a ratio of 13 would total $159,348. This represents an increase in value of 51.0 percent or a compound annual growth rate of 14.5 percent per year. Using the average ratio of 15.4, the value of the territory would be $188,766, a compound annual growth rate of 21.1 percent. Using the California average ratio of 19.2, the value of the territory would be $235,344, a compound annual growth rate of 30.2 percent. Exhibit 28 presents these calculations. The appreciation of his territory does not include the $16,122 in profit already collected by Mr. Martinez.

### b.     Discounted Cash Flow Analysis

96.     For the DCF method, I have calculated average weekly cash flow to be $2,567.11. With a ten percent discount rate (plus three percent inflation), Territory 6736 would be valued at $1,026,844. With a 25 percent discount rate, Territory 6736 would be valued at $476,749. The implied discount rate given the Flowers valuation is 77.0 percent; the average market valuation implied discount rate is 64.5 percent; and the California average market valuation implied discount rate is 51.2 percent. Exhibit 29 presents these calculations.

97.     Selling Territory 6736 on the open market would likely lead to a profit of more than $75,000, not including profits already collected by Mr. Martinez. A review of Martinez's documents show that he received net profits of $403,036 from April 2013 through April 2016.

### ii.     Business Expenses

### a.     Alleged Unreimbursed Business Expenses

98.     Mr. Martinez also alleges similar unreimbursed business expenses, namely: 1) vehicle-related expenses, 2) administrative fees, 3) handheld equipment expense, 4) warehouse

rent, 5) shrink, 6) cell phone and 7) depreciation.[64] Mr. Martinez has not provided an estimate of the depreciation expense to date. I will address his claims for depreciation when that information is provided.

99.     I have attached a table summarizing the expenses claimed by Mr. Martinez as Exhibit 30. This table displays the amounts either identified in source documents, business records, tax documents, or his testimony. I have calculated the total expenses for the categories above and compared those amounts to the claims in his interrogatory responses.[65] A comparison shows that Mr. Martinez's claims for administration fees, handheld equipment fees and warehouse rent are consistent with the amounts he identified in his deposition or his business plan. Mr. Martinez's claims for stale adjustment are larger than the amounts he identified in his deposition or business plan. No supporting documentation was provided to substantiate these amounts.

100.    Based on the testimony and documents provided by Mr. Martinez, if he is found to be an employee, his unreimbursed business expenses total $49,330. If, however, the unsupported claims made in his interrogatories are used, his unreimbursed business expenses total $51,941.[66]

101.    Additionally, based on my review of tax documents provided by Mr. Martinez, he has already claimed at least a portion of these business expenses as deductions, and thus, has already received a tax benefit. As such, Mr. Martinez would not be entitled to complete reimbursement of business expenses. This, ultimately, would reduce his purported damages.

**b.     Alleged "Unlawful Deductions"**

102.    Similar to Mr. Almendariz, Mr. Martinez makes a claim for alleged unlawful deductions in his interrogatory responses in the amount of $11,574.[67] After reviewing his

---

[64] *PLAINTIFF GIOVANNI MARTINEZ'S RESPONSE TO DEFENDANT FLOWERS BAKING CO. OF HENDERSON'S INTERROGATORIES, SET TWO*, April 21, 2016, Response to Interrogatory No. 11.
[65] I am excluding the six months that Mr. Martinez was out of state in this calculation.
[66] *Ibid*, Response to Interrogatory No. 11.
[67] *Ibid*, Response to Interrogatory No. 13.

records, I have calculated this amount to be $12,931.[68] These items are duplicative of items identified in his unreimbursed business expenses. If compensated for these amounts, he should receive one or the other.

### c.  Net Profits

103.  As I did with Mr. Almendariz, I reviewed Mr. Martinez's Distributor Summary Reports to determine his Pre-Reconciliation pay. I also identified the costs contained in the Distributor Summary Reports, as well as other expenses claimed by Mr. Martinez. I calculated his Post-Reconciliation pay, which is equivalent to his profits. His total Pre-Reconciliation pay was $459,345. His total Post-Reconciliation pay, or profit, was $403,036, or $2,567.11 per week. Exhibit 31 presents the detailed calculations. If it is determined that his claimed expenses are credible, his profits would be reduced by the additional $2,611 in expenses he claims in his interrogatory response. In that case, Mr. Martinez's net profits would be $456,734.

### d.  Hourly Rate

104.  I also calculated the effective hourly rate earned by Mr. Martinez. I was asked to calculate a net effective hourly rate, assuming expenses are deducted from earnings and that Mr. Martinez worked the schedule that he testified to in his deposition.[69] If the hours claimed by Mr. Martinez are determined to be not credible, the hourly rates may change. A reduction in hours worked would increase his effective hourly rate. For the period April 2013 through April 2016,[70] his average effective hourly wage is $36.74. On a weekly basis, he earned an effective hourly rate as high as $176.66 and as low as $18.55.

105.  Alternatively, I was asked to calculate the effective hourly rate for Mr. Martinez if the expenses were fully reimbursed, i.e., Mr. Martinez is deemed to be an employee and expenses are reimbursed. Under that assumption, the average effective hourly rate for Mr. Martinez would be $41.87. On a weekly basis, Mr. Martinez would have earned an effective

---

[68] Again, I am excluding the six months that Mr. Martinez was out of state in this calculation.
[69] *DEPOSITION OF GIOVANNI MARTINEZ*, December 17, 2015, 223:7-226:22.
[70] Again, I am excluding the six months that Mr. Martinez was out of state in this calculation.

hourly rate as high as $180.37 and as low as $23.44. Exhibit 32 shows the effective hourly rates on a weekly and overall basis.

106.    Mr. Martinez's wages, net or gross of expenses, far exceed industry average rates for employee delivery drivers in the Long Beach/Los Angeles area.

### iii.    Alleged Missed Meal and Rest Periods

107.    I calculated missed meal and rest period penalties using Mr. Martinez's weekly effective rates through April 23, 2016, as shown in Exhibit 33. Mr. Martinez claimed he did not personally service his route between February 1, 2014 and June 7, 2014.[71] From his interrogatory responses, Mr. Martinez claims to miss five meal periods per week and six rest periods per week.[72] Assuming he missed five meal periods per week and six rest periods per week and there were six months when he did not work his territory, I have estimated his total missed meal penalties to be $22,587 and his missed rest penalties to be $27,105. Mr. Martinez claims in his interrogatory responses that he should receive $20,489 for meal period penalties and $24,532 for rest period penalties. [73]

108.    I have provided a table at Exhibit 34 which displays six scenarios if Mr. Martinez is determined to be an employee and his claims of five missed meal and six missed rest periods is unpersuasive. The range of both missed meal and rest period penalties is $0 to $49,692.

### iv.    Alleged Inaccurate Wage Statement Penalties

109.    In addition to meal and rest period penalties, Mr. Martinez claims he should receive $4,000 in inaccurate wage statements penalties.[74] If he is determined to be an employee, the determination of inaccurate wage statement penalties is a statutory matter which would be calculated by the finder of fact or law.

---

[71]    *PLAINTIFF GIOVANNI MARTINEZ'S RESPONSE TO DEFENDANT FLOWERS BAKING CO. OF HENDERSON'S INTERROGATORIES, SET TWO*, April 21, 2016, Response to Interrogatory No. 12.
[72]    *Ibid*, Response to Interrogatory No. 16 & No. 18.
[73]    *Ibid*, Response to Interrogatory No. 21.
[74]    *Ibid*, Response to Interrogatory No. 21.

### E.      Martin Salazar

#### i.      Territory Valuation – Territories 6821 & 6822

110.     Martin Salazar, through his corporation, Zar Services Inc., entered into two Distributor Agreements. The first Distributor Agreement, signed on April 15, 2013,[75] transferred to Mr. Salazar from Flowers Baking Co. of California, LLC the distribution rights for Flowers' products in Territory 6821, located in the East Los Angeles area of Bell Gardens. Zar Services Inc. agreed to pay $113,454 for those rights. The second Distributor Agreement, also signed on April 15, 2013,[76] transferred to Mr. Salazar from Flowers Baking Co. of California, LLC the distribution rights for Flowers' products in the East Los Angeles area of Huntington Park, Territory 6822. Zar Services Inc., agreed to pay $76,727 for those rights. The valuation for Territory 6821 was based on $4,012 in weekly Non-Sara Lee sales and $7,662 in weekly Sara Lee sales. Sara Lee sales were valued at 8 times weekly average, and non-Sara Lee sales were valued at 13 times weekly average.[77]

#### a.      Relative Valuation – Ratio Analysis

111.     Mr. Salazar's average weekly revenue for the most recent six months for Territory 6821 is $7,308.82 and for Territory 6822 is $7,369.44. The valuation of Territory 6821 and 6822 based on a ratio of 13 would total $95,015 and $95,803. This represents a decrease in value of 16.3 percent for Territory 6821, a compound annual growth rate of -5.7 percent, and an increase of 24.9 percent or a compound annual growth rate of 7.6 percent per year for Territory 6822. Using the average ratio of 15.4, the value of the Territory 6821 would be $112,556, a compound annual growth rate of -0.3 percent, and the value of Territory 6822 would be $113,489, a compound annual growth rate of 13.8 percent. Using the California average ratio of 19.2, the values of the Territory 6821 and 6822 would be $140,329 and $141,493, representing compound

---

[75] *FLOWERS BAKING CO. OF CALIFORNIA, LLC, DISTRIBUTOR AGREEMENT*, p. 23, (FLO-MAR0000542-0000575).
[76] *FLOWERS BAKING CO. OF CALIFORNIA, LLC, DISTRIBUTOR AGREEMENT*, p. 23, (FLO-MAR0000473-0000512).
[77] *TERRITORY PRO FORMA, TERRITORY 6821,* (FLO-MAR0000605). *TERRITORY PRO FORMA, TERRITORY 6822,* (FLO-MAR0000517).

annual growth rates of 7.3 percent and 22.3 percent, respectively. Exhibit 35 presents these calculations.

### b.      Discounted Cash Flow Analysis

112.    For the DCF method, I have calculated average weekly cash flow for Territory 6821 to be $2,024.54 and for 6822 to be $1,236.77. With a ten percent discount rate (plus three percent inflation), Territory 6821 would be valued at $809,816, and 6822 would be valued at $494,710. With a 25 percent discount rate, Territory 6821 would be valued at $375,986, and Territory 6822 would be valued at $229,687. The implied discount rate given the Flowers valuation are 107.8 percent and 64.1 percent; the average market valuation implied discount rates are 90.5 percent and 53.7 percent; and the California average market valuation implied discount rates are 72.0 percent and 42.5 percent. Exhibit 36 presents those calculations.

113.    Selling Territories 6821 and 6822 on the open market would likely lead to a profit of more than $35,000, not including profits already collected by Mr. Salazar. A review of Salazar's documents show that he received net profits of $375,515 from April 2013 through April 2016.

### ii.      Business Expenses

### a.      Alleged Unreimbursed Business Expenses

114.    Mr. Salazar also alleges similar unreimbursed business expenses, namely: 1) vehicle-related expenses, 2) administrative fees, 3) handheld equipment expense, 4) warehouse rent, 5) shrink, 6) cell phone and 7) depreciation.[78] Mr. Salazar has not provided an estimate of the depreciation expense to date. I will address his claims for depreciation when that information is provided.

115.    I have attached a table summarizing the expenses claimed by Mr. Salazar as Exhibit 37. This table displays the amounts either identified in source documents, business records, tax documents, or his testimony. I have calculated the total expenses for the categories

---

[78] *PLAINTIFF MARTIN SALAZAR'S RESPONSE TO DEFENDANT FLOWERS BAKING CO. OF HENDERSON'S INTERROGATORIES, SET TWO*, April 21, 2016, Response to Interrogatory No. 11.

above and compared those amounts to the claims in his interrogatory responses. A comparison shows that Mr. Salazar's claims for administrative fees, handheld equipment fees, warehouse rent, and shrink are consistent with the amounts he identified in his deposition or his business plan. Mr. Salazar's claims for vehicle expenses are almost double the amounts he identified in his deposition or business plan. No supporting documentation was provided to substantiate these amounts.

116.    Based on the testimony and documents provided by Mr. Salazar, if he is found to be an employee, his unreimbursed business expenses total $54,002. If, however, the unsupported claims made in his interrogatories are used, his unreimbursed business expenses total $97,140.[79]

117.    Additionally, based on my review of tax documents provided by Mr. Salazar, he has already claimed at least a portion of these business expenses as deductions, and thus, has already received a tax benefit. As such, Mr. Salazar would not be entitled to complete reimbursement of business expenses. This, ultimately, would reduce his purported damages.

### b.    Alleged "Unlawful Deductions"

118.    Similar to Mr. Almendariz, Mr. Salazar makes a claim for alleged unlawful deductions in his interrogatory responses in the amount of $10,955.[80] After reviewing his records, I have calculated this amount to be $11,126. These items are duplicative of items identified in his unreimbursed business expenses. If compensated for these amounts, he should receive one or the other.

### c.    Net Profits

119.    As I did with Mr. Almendariz, I reviewed Mr. Salazar's Distributor Summary Reports to determine his Pre-Reconciliation pay for the territory he primarily worked. I also identified the costs contained in the Distributor Summary Reports, as well as other expenses claimed by Mr. Salazar. I calculated his Post-Reconciliation pay, which is equivalent to his profits. His total Pre-Reconciliation pay for Territory 6822 was $249,411. His total Post-

---

[79] *Ibid*, Response to Interrogatory No. 11.
[80] *Ibid*, Response to Interrogatory No. 13.

Reconciliation pay, or profit, was $195,410, or $1,236.77 per week. Exhibit 38 presents the detailed calculations.

### d.    Hourly Rate

120.    I also calculated the effective hourly rate earned by Mr. Salazar. I was asked to calculate a net effective hourly rate, assuming expenses are deducted from earnings and that Mr. Salazar worked the schedule that he testified to in his deposition.[81] If the hours claimed by Mr. Salazar are determined to be not credible, the hourly rates may change. A reduction in hours worked would increase his effective hourly rate. For the period April 2013 through April 2016, his average effective hourly wage is $22.71. On a weekly basis, he earned an effective hourly rate as high as $42.75 and as low as -$3.82. If the earnings from Territory 6821 are included in Mr. Salazar's Post-Reconciliation pay, then the average effective hourly rate is $43.65.

121.    Alternatively, I was asked to calculate the effective hourly rate for Mr. Salazar if the expenses were fully reimbursed, i.e., Mr. Salazar is deemed to be an employee and expenses are reimbursed. Under that assumption, the average effective hourly rate for Mr. Salazar would be $28.99. On a weekly basis, Mr. Salazar would have earned an effective hourly rate as high as $48.40 and as low as $9.80. If I include earnings from Territory 6821,[82] the effective hourly rate would be $53.36. Exhibit 39 shows the effective hourly rates on a weekly and overall basis.

122.    Mr. Salazar's wages, net or gross of expenses, far exceed industry average rates for employee delivery drivers in the Los Angeles area.

### iii.    Alleged Missed Meal and Rest Periods

123.    I calculated missed meal and rest period penalties using Mr. Salazar's weekly effective rates through April 23, 2016, as shown in Exhibit 40. From his interrogatory responses, Mr. Salazar claims to miss five meal periods per week and five rest periods per week.[83] He also claims to have taken 11 weeks of vacation.[84] Assuming he missed five meal periods per week

---

[81] *Ibid*, Response to Interrogatory No. 18. Deposition of Martin Salazar, December 18, 2015, p. 304:23-305:10, p. 220:24-221:3.
[82] These earnings would exclude the expenses and would take 60 percent of the Pre-Reconciliation pay.
[83] *Ibid*, Response to Interrogatory No. 16 & No. 18.
[84] *Ibid*, Response to Interrogatory No. 18.

and five rest periods per week and took 11 weeks of vacation, I have estimated his total missed meal penalties to be $16,797 and his missed rest penalties to be $16,930. Mr. Salazar claims in his interrogatory responses that he should receive $22,024 for meal period penalties and $23,204 for rest period penalties.[85]

124.    I have provided a table at Exhibit 41 which displays six scenarios if Mr. Salazar is determined to be an employee and his claims of five missed meal and five missed rest periods is unpersuasive. The range of both missed meal and rest period penalties is $0 to $33,727.

### iv.    Alleged Inaccurate Wage Statement Penalties

125.    In addition to meal and rest period penalties, Mr. Salazar claims he should receive $4,000 in inaccurate wage statements penalties.[86] If he is determined to be an employee, the determination of inaccurate wage statement penalties is a statutory matter which would be calculated by the finder of fact or law.

## III.    CONCLUSION

126.    As shown above, I have arrived at three general conclusions which apply to all Plaintiffs in this matter:

1)    The distribution rights for Flowers' products in a geographic market and the ability to transfer those rights create an economic asset which is held by all Plaintiffs;

2)    Based on various valuation methodologies, it is very likely that Plaintiffs could sell the rights to their territories for an amount in excess of what was originally paid – at least one Plaintiff sold a portion of his territory and profited from that sale; and

3)    An analysis of each Plaintiff's owner-operated territory shows that all Plaintiffs earned in excess of $14 per hour, and four earned in excess of $20 per hour.

---

[85] *Ibid*, Response to Interrogatory No. 21.
[86] *Ibid*, Response to Interrogatory No. 21.

127.    Additionally, I understand that this action depends on a determination of whether these Plaintiffs are determined to be independent contractors. If Plaintiffs are determined to be correctly classified as independent contractors, damages in this case are $0. If it is determined that Plaintiffs were misclassified as independent contractors, damages will depend on additional findings made by the trier of fact and/or law. The calculations presented above provide a range of potential damages.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 4th day of May, 2016 at Los Angeles, California

Joseph A. Krock, Ph.D.

– 38 –