# EXHIBIT B

## DISTRIBUTOR AGREEMENT
## TABLE OF CONTENTS

| ARTICLE | | PAGE |
|---|---|---|
| I. | WARRANTY | 1 |
| II. | DEFINITIONS | 2 |
| III. | RELATIONSHIP | 3 |
| IV. | SALE OF PRODUCTS AND AUTHORIZED PRODUCTS | 4 |
| V. | BEST EFFORTS/DISTRIBUTOR | 4 |
| VI. | BEST EFFORTS/COMPANY | 4 |
| VII. | ACCOUNTS/TRADEMARKS EXEMPT FROM AGREEMENT | 5 |
| VIII. | PAYMENT FOR PRODUCTS | 5 |
| IX. | EQUIPMENT AND INSURANCE | 6 |
| X. | PROPRIETARY SERVICES | 7 |
| XI. | PRODUCT DELIVERY | 8 |
| XII. | PRODUCT CODE | 8 |
| XIII. | ADVERTISING AND PROMOTIONS | 8 |
| XIV. | SERVICE REQUIREMENTS | 9 |
| XV. | TRANSFER OR SALE OF RIGHTS | 9 |
| XVI. | INDEPENDENT BUSINESS | 10 |
| XVII. | TERMINATION BY COMPANY | 11 |
| XVIII. | DISPUTE RESOLUTION | 13 |
| X1X. | TRADEMARKS AND TRADENAMES | 14 |
| XX. | MISCELLANEOUS | 16 |
| EXHIBIT A – TERRITORY | | 20 |
| EXHIBIT B – PRODUCTS | | 21 |
| EXHIBIT C – AUTHORIZED PRODUCTS | | 22 |
| EXHIBIT D – BILL OF SALE | | 23 |
| EXHIBIT E – OWNER | | 24 |
| EXHIBIT F – PERSONAL GUARANTY | | 25 |
| 6 MONTH BUYBACK ADDENDUM | | 26 |
| SUBLICENSING AGREEMENT | | 27 |



EXHIBIT
9
Martinez  12/17/15
PENGAD 800-631-6989

FLO-MAR0000768

# FLOWERS BAKING CO. OF CALIFORNIA, LLC
## DISTRIBUTOR AGREEMENT

This Distributor Agreement ("Agreement") is made effective the **22nd** day of **April, 2013**, by and between **FLOWERS BAKING CO. OF CALIFORNIA, LLC**, a California limited liability company with offices and its principal place of business at **10625 Poplar Avenue, Fontana, CA 92237** (herein "COMPANY"), and **Giovanni Martinez**, a **California** corporation, with its principal place of business at **123 Poinsettia Ave, Monrovia, CA. 91016** (herein "DISTRIBUTOR").

## WITNESSETH:

Whereas, COMPANY has developed or acquired a license or franchise for the use of formulae, recipes, trademarks and trade names through which it manufactures and/or markets bread, rolls, and other fresh-baked products, as defined herein; and

Whereas, COMPANY, through the expenditure of time and effort and through its continuing research and marketing programs, has over the years developed a reputation for excellence in quality, value, and superior service which has created strong consumer recognition, approval, and demand for its products; and

Whereas, COMPANY has determined that the division of a portion of its market area into distribution territories, and the sale of its products to Independent Distributors for distribution and ultimate retail sale in said territories, will result in a superior distribution system; and

Whereas, DISTRIBUTOR is an independent contractor with the resources, expertise and capability to act as a distributor of COMPANY's products in the Territory; and

Whereas, the parties desire to create a right in DISTRIBUTOR, under which DISTRIBUTOR will be authorized to sell certain defined products within a specified geographic area.

Now, therefore, in consideration of these premises, and of the covenants and conditions contained in this Agreement, and for other good and valuable consideration given and received, the receipt and the sufficiency of which are hereby specifically agreed to and acknowledged, the parties mutually agree as follows:

## I. WARRANTY

1.1     The foregoing preambles are incorporated herein by reference and shall constitute warranties, representations, agreements and undertakings by the parties.

## II. DEFINITIONS

FLO-MAR0000769

2.1 **Outlets:** Shall mean all retail stores (except thrift stores) selling food to the general public and all restaurant, fast food, military and institutional accounts, in each case which allow direct store delivery (DSD) of Products and/or Authorized Products, except those exempt from this Agreement as set forth in Article VII, below.

2.2 **Products:** Shall mean fresh baked goods, as specifically described in Exhibit B, attached hereto and made a part hereof, which are currently produced and/or distributed by COMPANY, provided, however, that the Distribution Rights granted herein shall survive only so long as COMPANY has the legal right to produce and sell such goods, whether by ownership, license, franchise, or otherwise, and COMPANY produces and/or sells such goods. Products shall not include products other than those specifically described in Exhibit B nor products intended to be sold as frozen or refrigerated.

2.3 **Authorized Products:** Shall mean fresh baked goods, as specifically described in Exhibit C, attached hereto and made a part hereof, provided, however, that DISTRIBUTOR does not acquire any proprietary or ownership rights to such Authorized Products, exclusive or non-exclusive. COMPANY may cease selling such Authorized Products to DISTRIBUTOR upon notice, with or without cause. COMPANY may also add Authorized Products to Exhibit C upon notice to DISTRIBUTOR. Authorized Products may include products with logos and/or labels, or without.

2.4 **Distribution Rights:** Except as expressly limited by this Agreement, Distribution Rights shall mean the right to sell and distribute Products to Outlets in the Territory, which right has been purchased by DISTRIBUTOR from COMPANY as evidenced by a Bill of Sale executed by the parties, which is attached hereto as Exhibit D, and made a part hereof.

2.5 **Territory:** Shall mean that geographic area as more specifically described in Exhibit A within which DISTRIBUTOR owns the Distribution Rights.

2.6 **Good Industry Practice:** Shall mean the standards that have developed and are generally accepted and followed in the baking industry, including, but not limited to, maintaining an adequate and fresh supply of Products and Authorized Products in all Outlets requesting service, actively soliciting all Outlets not being serviced, properly rotating all Products and Authorized Products, promptly removing all stale Products and Authorized Products, maintaining proper service and delivery to all Outlets requesting service in accordance with Outlet's requirements, maintaining all equipment in a sanitary condition and in good safe working order, and operating the Distributorship in compliance with all applicable federal, state and local laws, rules and regulations, including but not limited to, all motor vehicle, food, drug, health, bioterrorism, security, and sanitary laws and regulations. Failure to comply with all applicable laws and regulations shall be deemed a material breach as specifically set forth in Sections 17.2 herein.

FLO-MAR0000770

2.7  **Stale:**  Shall mean Products and Authorized Products removed from the market on the appropriate color code or designated pick up date.

2.8  **Out of Code:**  Shall mean Products and Authorized Products left in the market beyond the appropriate color code or designated pick up date.

2.9  **Chain:**  Shall mean a person or business entity that operates more than one Outlet and/or which makes centralized decisions regarding the purchase of Products and/or Authorized Products for more than one Outlet.

2.10  **Owner:**  Shall mean the individual holding a majority ownership in the stock of DISTRIBUTOR and listed on Exhibit E hereto.  Such individual must personally guarantee the conditions and obligations herein by executing the Personal Guarantee, Exhibit F, attached hereto and made a part hereof.

### III. RELATIONSHIP

3.1  **Extent and Duration:**  COMPANY hereby recognizes DISTRIBUTOR's ownership of the Distribution Rights, said ownership to continue until:

(a) transferred, assigned or sold by DISTRIBUTOR or anyone acting on behalf of DISTRIBUTOR (this includes a sale by COMPANY for the account of DISTRIBUTOR in the event of a termination of this Agreement upon the terms defined below), or

(b) COMPANY, for legitimate business reasons, ceases to use distributors to distribute Products in the **Carson** market area.  In such event, COMPANY will repurchase the Distribution Rights from DISTRIBUTOR at thirteen (13) times the average weekly sales volume of Products and Authorized Products in the Territory calculated over the six (6) month period preceding the repurchase, or

(c) either party exercises its right to terminate pursuant to Section 16.1.  In such event, COMPANY will repurchase the Distribution Rights from DISTRIBUTOR at fair market value.

3.2  **Nature of Rights:**  The parties agree that the Distribution Rights sold to DISTRIBUTOR pursuant to the Bill of Sale can be exercised only pursuant to the terms of this Agreement and that any termination of this Agreement other than in accordance with Section 3.1 (b) or (c) requires DISTRIBUTOR, or anyone acting on behalf of DISTRIBUTOR, to sell such Distribution Rights subject to the terms of this Agreement.

3.3  **Form of Business:**  DISTRIBUTOR agrees to organize his business as a corporation, and agrees to at all times retain at least 51% of the ownership.

### IV.  SALE OF PRODUCTS AND AUTHORIZED PRODUCTS

FLO-MAR0000771

4.1     Products and Authorized Products will be sold to DISTRIBUTOR at such terms and prices as established by COMPANY from time to time.   Title and risk of loss shall pass to DISTRIBUTOR upon delivery to DISTRIBUTOR as set forth in Section 11.1 below.

### V. BEST EFFORTS/DISTRIBUTOR

5.1     **Obligations of DISTRIBUTOR:**     DISTRIBUTOR agrees and covenants to use DISTRIBUTOR's commercially reasonable best efforts to develop and maximize the sale of Products to Outlets within the Territory and service the Territory in accordance with Good Industry Practice as defined above.   DISTRIBUTOR further agrees and covenants to use DISTRIBUTOR's commercially reasonable best efforts to maximize the sale of Authorized Products to those Outlets in the Territory for which such Authorized Products have been produced and to distribute such Authorized Products to such Outlets in accordance with Good Industry Practice as defined above, including full rack service if required by the Outlet. DISTRIBUTOR shall cooperate with COMPANY on its marketing and sales efforts and maintain a clean and neat personal appearance consistent with the professional image customers and the public associate with COMPANY, and customer requirements.   DISTRIBUTOR may not carry outside merchandise which is competitive with the Products or Authorized Products. DISTRIBUTOR may carry noncompetitive products, as long as this does not interfere with the distribution of the Products or Authorized Products.

5.2     **Non-Compliance:**   Failure to comply with Section 5.1 above and/or any of the terms, conditions and obligations elsewhere in this Agreement shall be considered a material breach of this Agreement and shall be governed by the provisions of this Agreement dealing with termination.

### VI. BEST EFFORTS/COMPANY

6.1     **Obligations of Company:**   COMPANY shall use its commercially reasonable best efforts to manufacture and deliver to DISTRIBUTOR sufficient quantities of Products and Authorized Products to supply Outlets requesting service in the Territory, preserve and develop the quality and marketability of the Products, and cooperate with DISTRIBUTOR in DISTRIBUTOR's sales efforts.   In order to assist DISTRIBUTOR with product sales to Chains, which may require COMPANY involvement to obtain authorization to sell Products or Authorized Products, DISTRIBUTOR hereby designates COMPANY and COMPANY agrees to act as DISTRIBUTOR's agent to obtain such authorization. This agency designation is for the sole purpose of authorization discussions (including space, position and pricing) with regard to Chain accounts.   Nothing herein shall obligate COMPANY to seek authorization or otherwise pursue business opportunities with any specific Chain or other account.

FLO-MAR0000772

## VII. ACCOUNTS AND/OR TRADEMARKS EXEMPT FROM DISTRIBUTORSHIP

7.1   **Accounts Exempt From Agreement:**  COMPANY reserves the right to solicit and service drop delivery and other non-DSD accounts with Products and Authorized Products, in whole or in part, in DISTRIBUTOR's Territory, so long as it is done for legitimate business reasons and not for the purpose of undermining DISTRIBUTOR's business.

7.2   **Thrift Stores:**  COMPANY reserves the right to continue to sell Products and Authorized Products through its retail thrift store operation, COMPANY-owned and/or independently owned.

7.3   **Other Trademarks:**  The parties hereto stipulate that COMPANY and COMPANY affiliates produce a variety of products marketed under a variety of trademarks distributed through multiple channels of distribution.  This Agreement does not restrict any other distribution of products by COMPANY and COMPANY affiliates marketed under trademarks not listed on Exhibit B.

## VIII. PAYMENT FOR PRODUCTS

8.1   **Settlement of Account:**  On or before Friday of each week, DISTRIBUTOR will remit to COMPANY a full settlement of all Products and Authorized Products sold to DISTRIBUTOR in the preceding week, in accordance with terms established by COMPANY from time to time.

8.2   **Cash Sales:**  DISTRIBUTOR is solely responsible for the collection of all cash sales in the Territory.

8.3   **Non-Cash Sales:**  In cases where Products and/or Authorized Products are sold and distributed to Outlets which do not pay cash and which have been approved by COMPANY for credit and in its sole discretion, COMPANY will accept electronic data with corresponding proof of delivery, charge slips, Outlet-generated authorizations or other forms of payment authorizations as may be required by the Outlet or COMPANY (including but not limited to, authorizations signed by the Outlet's authorized representative, such as the store manager, or his designee) in lieu of cash, and credit DISTRIBUTOR's account therefor, provided DISTRIBUTOR fully complies with COMPANY's credit policies as established from time to time.  In the event DISTRIBUTOR fails to comply with COMPANY's credit policy, fails to provide complete documentation as required by the Outlet or COMPANY, or falsifies any documentation or credit information, COMPANY shall be entitled to charge DISTRIBUTOR's account for any credit extended to DISTRIBUTOR resulting therefrom without limiting any other remedies available to COMPANY.  DISTRIBUTOR is wholly responsible for collection of accounts receivable not authorized by COMPANY.  COMPANY is obligated to credit DISTRIBUTOR only for such payments made by the Outlet.

FLO-MAR0000773

8.4 **Chain Accounts:** COMPANY reserves the right to continue carrying the accounts receivable for all Chain and other major accounts and to promptly credit DISTRIBUTOR for all such accounts.

8.5 **Scan Based Trading:** In the event a Chain account implements Scanned Based Trading (SBT), Pay By Scan (PBS) or other accounting methodologies and/or technology, DISTRIBUTOR agrees to comply with policies and procedures as may be necessary to comply with such chain accounting and/or technology requirements.

8.6 **Security Interest:** To secure the prompt payment and timely performance of all indebtedness, obligations and liabilities of DISTRIBUTOR to COMPANY under this Agreement, whether now existing or hereafter arising, DISTRIBUTOR hereby grants and conveys to COMPANY a presently existing and continuing security interest in the Distribution Rights, in this Agreement, in all Products and/or Authorized Products now or hereafter in DISTRIBUTOR's possession, in all accounts now or hereafter arising out of the sale by DISTRIBUTOR of Products and/or Authorized Products, and in all proceeds thereof. DISTRIBUTOR agrees that this security interest attaches immediately upon execution of this Agreement by DISTRIBUTOR and that COMPANY has all of the rights of a secured party under the applicable Uniform Commercial Code, as amended from time to time. DISTRIBUTOR expressly authorizes COMPANY to file and refile all appropriate Uniform Commercial Code financing statements necessary to perfect the security interests granted hereunder.

8.7 **Default:** Nothing herein shall be deemed to require COMPANY to fill an order of DISTRIBUTOR during the time when DISTRIBUTOR has failed to make any payment due to COMPANY in a timely fashion.

## IX. EQUIPMENT AND INSURANCE

9.1 **Delivery Vehicle(s):** DISTRIBUTOR is responsible for obtaining DISTRIBUTOR's own delivery vehicle(s) and purchasing adequate insurance thereon, as described in Section 9.2 below. Consistent with good industry practice, DISTRIBUTOR agrees to keep the delivery vehicle(s) clean at all times and in a manner consistent with the professional image customers and the public associates with COMPANY, and to maintain the delivery vehicle(s) in such condition as to provide safe, prompt, and regular service to all customers. If required, DISTRIBUTOR agrees to have painted in a conspicuous manner on any delivery vehicle owned or leased by it to carry out the terms hereof: "Owned and Operated by (DISTRIBUTOR's name), An Independent Contractor."

9.2 **Insurance:** DISTRIBUTOR shall maintain at all times throughout the duration of this Agreement insurance policies from reputable and established insurance companies licensed to do business in

FLO-MAR0000774

the state(s) in which the Territory is located, and naming COMPANY as an additional insured party on all such insurance policies for the following coverages:

    **(a)** Automobile liability insurance on any vehicle used in the business, in such amounts as may reasonably be established by COMPANY, which as of the date of this Agreement will include combined single limit coverage of at least $1,000,000; and collision and comprehensive loss coverage for the actual cash or replacement cost value of any and all delivery vehicles operated by DISTRIBUTOR. Such coverage shall be primary and not contributory to any other coverage available to COMPANY;

    **(b)** Comprehensive general liability coverage, in such amounts as may reasonably be established by COMPANY, which as of the date of this Agreement will include combined single limit coverage of at least $1,000,000. Such coverage shall be primary and not contributory to any other coverage available to COMPANY;

    **(c)** Workers compensation coverage for any and all employees of DISTRIBUTOR in compliance with all requirements and laws of the state or states in which DISTRIBUTOR operates; and

    **(d)** DISTRIBUTOR shall provide COMPANY with written evidence of insurance and endorsement upon request by COMPANY.

## X. PROPRIETARY SERVICES

**10.1** **Services Provided:** COMPANY shall make available, and DISTRIBUTOR shall use, certain proprietary administrative services in order to assist DISTRIBUTOR in the conduct of DISTRIBUTOR's business for the following purposes: (i) collection of sales data; (ii) preparation of sales tickets; (iii) accumulation of sales histories; (iv) preparation of daily and weekly settlements; (v) preparation of automated "adds" to and "cuts" from DISTRIBUTOR's daily order of Products and Authorized Products; (vi) direct communication to COMPANY for the purpose of DISTRIBUTOR's ordering of product and receipt of daily load information; (vii) providing automated route book information; (viii) providing automatic product movement information; (ix) providing individual customer sales profiles; and (x) providing suggested orders for each customer.

**10.2** **Administrative Fee:** COMPANY shall charge, and DISTRIBUTOR shall pay, a fair market, reasonable administrative fee for these services, which shall be established from time to time by COMPANY.

**10.3** **Confidentiality:** DISTRIBUTOR agrees to maintain and hold in confidence any and all information obtained from or derived about COMPANY's proprietary administrative services pursuant to the provisions of Section 20.8.

FLO-MAR0000775

**10.4**   **No Proprietary Rights:**   DISTRIBUTOR acknowledges that DISTRIBUTOR cannot and shall not acquire any proprietary rights in COMPANY's proprietary administrative services and no rights shall accrue to DISTRIBUTOR by virtue of the use of the proprietary administrative services.   The right to use these proprietary administrative services shall not be assigned by DISTRIBUTOR without the express written consent of COMPANY.

**10.5**   **Termination or Amendment of Services:**   This provision shall remain in effect for as long as this Agreement is in effect.   However, in the event this Agreement is terminated for any reason, so shall DISTRIBUTOR's right to use the proprietary administrative services.   COMPANY may, in its sole discretion, alter, amend or terminate the proprietary administrative services herein made available by the giving of fourteen (14) calendar days notice to DISTRIBUTOR.

**10.6**   **Accurate and Truthful Reporting:**   DISTRIBUTOR shall at all times utilize the proprietary services in an honest and ethical manner.   This specifically includes accurate and truthful reporting of transactions and related information so as to allow COMPANY to comply with applicable disclosure and reporting requirements.   COMPANY reserves the right to audit DISTRIBUTOR's transactional records and inventory to ensure accurate and truthful reporting and COMPANY's compliance with applicable legal requirements.

## XI.  PRODUCT DELIVERY

**11.1**   COMPANY shall deliver Products and Authorized Products to DISTRIBUTOR at a location specified by COMPANY. DISTRIBUTOR will be charged a fee for warehouse use.

## XII.  PRODUCT CODE

**12.1**   Maintaining a fresh market is a fundamental tenet of the baking industry.   Accordingly, Out of Code Products or Authorized Products left in the market is a material breach of this Agreement. Repeated violations will be grounds for termination of this Agreement.

**12.2**   To assist DISTRIBUTOR in maintaining a fresh market, COMPANY will repurchase a certain percentage of DISTRIBUTOR's Stale Products or Authorized Products, at a price equal to DISTRIBUTOR's cost of such product, in accordance with COMPANY's Stale allowance policy as established by COMPANY from time to time.

**12.3**   DISTRIBUTOR may not sell any Out of Code Products or Authorized Products,  or those not in a saleable condition for distribution to the general public, but may otherwise sell such products to purchasers for non-human consumption.

## XIII.  ADVERTISING AND PROMOTIONS

**13.1**   COMPANY will provide all COMPANY initiated advertising material at no cost to DISTRIBUTOR, including, but not limited to, point of sale material and COMPANY scheduled

FLO-MAR0000776

media advertising.   Subject to COMPANY's prior approval, which approval will not be unreasonably withheld, DISTRIBUTOR may use other advertising materials.

13.2   DISTRIBUTOR will adhere to all promotions and feature pricing with respect to the major and Chain accounts in the Territory.   Such promotions and feature pricing are optional with respect to local accounts.   When DISTRIBUTOR follows promotions or feature pricing, DISTRIBUTOR will receive a reduction in the purchase price accounting for such promotion or feature pricing, such that DISTRIBUTOR and COMPANY share the price allowance.   With respect to local accounts, DISTRIBUTOR shall be required to provide COMPANY with sufficient proof that the promotion or feature pricing was extended to the local accounts(s) in order to obtain a pricing adjustment for such sales.   DISTRIBUTOR and COMPANY will each share in any resulting pricing allowance(s).

## XIV.  SERVICE REQUIREMENTS

14.1   DISTRIBUTOR is responsible for providing proper service of the Territory at all times.

14.2   If DISTRIBUTOR does not service the Territory, for any reason, COMPANY reserves the right to service the Territory, and DISTRIBUTOR agrees to pay a daily fee plus operating expenses. Such temporary service by COMPANY does not relieve DISTRIBUTOR of the obligation imposed on it by the AGREEMENT nor act to cure any breach by DISTRIBUTOR.

## XV.  TRANSFER OR SALE OF RIGHTS

15.1   **Conditions:**   The Distribution Rights are owned by the DISTRIBUTOR and may be sold or transferred in whole or in part by DISTRIBUTOR, or anyone acting on behalf of DISTRIBUTOR, subject to the prior written approval of COMPANY, which approval shall not be unreasonably withheld.  Any sale or transfer of the Distribution Rights must be bona fide, for legitimate business purposes, and compliant with all applicable laws.   Additionally, the prospective purchaser or transferee must be fully qualified to meet all of the obligations under this Agreement. COMPANY's right of approval in this Section shall expire if not exercised within thirty (30) days after the later of (a) receipt by COMPANY of written notice from DISTRIBUTOR of its intent to sell or transfer to a named bona fide purchaser or transferee on terms and conditions fully set forth in such notice, and (b) an evaluation by COMPANY of the proposed purchaser or transferee. DISTRIBUTOR shall execute and deliver to COMPANY and its affiliates a release of all its interests and claims to and in such Distribution Rights and all of its interests under or arising out of this Agreement, together with a general release of claims against COMPANY and its affiliates, in the event of any transfer or sale of the Distribution Rights.   COMPANY will concurrently execute a general release of claims as to DISTRIBUTOR, except for any claim for monies due and owing COMPANY.

FLO-MAR0000777

**15.2**   **Right of First Refusal:**   Notwithstanding the foregoing, any sale or transfer of the Distribution Rights, in whole or in part, shall be subject to a right of first refusal on the part of COMPANY at the same terms and conditions offered to DISTRIBUTOR, or anyone acting on behalf of DISTRIBUTOR by a qualified and bona fide purchaser or transferee. In the event the contemplated sale or transfer is to a related person for less than fair market value, the price to be paid by the COMPANY to exercise its right of first refusal shall be the fair market value of the Distribution Rights. COMPANY shall exercise its rights hereunder by giving written notice of its exercise to DISTRIBUTOR within the time period specified in Section 15.1 above, and shall promptly pay the purchase price and satisfy the other terms and conditions of sale set forth in DISTRIBUTOR's notice, all subject to delivery by DISTRIBUTOR of satisfactory transfer documents and the releases provided in Section 15.1 above.

**15.3**   **Settlement of Account:**   No transfer or sale of DISTRIBUTOR's rights under this Agreement is to be made unless and until DISTRIBUTOR has settled with COMPANY all outstanding accounts and settled all other outstanding liens and debts related to the Distributorship; provided, however, that COMPANY may waive this requirement depending on the circumstances of the particular transaction, including if it is satisfied that under the terms of the sale, the purchaser assumes all such liabilities and is financially capable of such assumption.

**15.4**   **Transfer Fee:**   In the event of a sale by DISTRIBUTOR, or by anyone acting on behalf of DISTRIBUTOR (including a sale by COMPANY for the account of DISTRIBUTOR), of DISTRIBUTOR's Distribution Rights, DISTRIBUTOR shall pay a transfer fee to COMPANY in an amount equal to five percent (5%) of such gross sales price, but not less than $2,000, in consideration of the administrative activities undertaken by COMPANY in connection with such sale.

**15.5**   **Taxes and Reporting Requirements:**   DISTRIBUTOR shall be responsible for all taxes and transactional reporting requirements, including but not limited to the nature of the conveyance, related to the transfer or sale of the Distribution Rights.

## XVI. INDEPENDENT BUSINESS

**16.1**   **Essential Term:**   The status of DISTRIBUTOR pursuant to this Agreement is that of common law independent contractor and the parties hereby signify their express intention to this effect. DISTRIBUTOR shall not be controlled by COMPANY as to the specific details or manner of DISTRIBUTOR's business, it being understood that the primary interest of COMPANY is the results achieved by DISTRIBUTOR. DISTRIBUTOR's business is separate and apart from that of COMPANY and it is of the essence of this Agreement that DISTRIBUTOR is an independent business. Any final judicial determination that DISTRIBUTOR is not a common law

FLO-MAR0000778

independent contractor shall entitle either party to cancel this Agreement. Neither DISTRIBUTOR nor any of DISTRIBUTOR's employees, agents, or servants shall be considered or deemed in any way to be employees, agents or servants of COMPANY and neither party has the right or power, express or implied, to do any act or thing that would bind the other, except as herein specifically provided. The parties do not intend to act as joint employers, parent/subsidiary, joint venturers, or any other legal capacity other than separate and distinct businesses acting pursuant to the terms of this Agreement. Furthermore, none of the benefits provided by COMPANY to its employees are available from COMPANY to DISTRIBUTOR or to DISTRIBUTOR's employees, agents, or servants. In the event DISTRIBUTOR and/or DISTRIBUTOR's employees, agents or servants hereafter become eligible to participate in any such benefits, DISTRIBUTOR, on behalf of DISTRIBUTOR and DISTRIBUTOR's employees, agents and servants, hereby waives any right to participate in such benefits. Such waiver is not dependent upon DISTRIBUTOR's status as an independent contractor. DISTRIBUTOR will be solely and entirely responsible for DISTRIBUTOR's acts and for the acts of DISTRIBUTOR's employees, agents, and servants during the performance of this Agreement, and will save and hold COMPANY harmless from any and all damages which may arise therefrom, including attorneys' fees.

16.2   **Non-Personal Service:** This Agreement does not require that DISTRIBUTOR's obligations hereunder be conducted personally, or by any specific individual in DISTRIBUTOR's organization. DISTRIBUTOR shall be free to engage such persons as DISTRIBUTOR deems appropriate to assist in discharging DISTRIBUTOR's responsibilities hereunder. Any breach of this Agreement by any person engaged by DISTRIBUTOR shall be deemed to be a breach by DISTRIBUTOR.

16.3   **Professional Services:** DISTRIBUTOR may engage any legal and/or accounting professional services it deems necessary for purposes of legal compliance, meeting its obligations under this Agreement, and otherwise.

## XVII. TERMINATION BY COMPANY

17.1   **Performance:** Except as set forth in Sections 3.1 (b) and (c) and 16.1 above, or this Article, COMPANY shall not terminate or cancel this Agreement, provided DISTRIBUTOR faithfully carries out the terms hereof. In the event DISTRIBUTOR fails to perform DISTRIBUTOR's obligations under this Agreement, COMPANY may terminate this Agreement as set forth below.

17.2   **Non-Curable Breach:** COMPANY may terminate upon twenty-four (24) hours' written notice and DISTRIBUTOR shall have no right to cure if DISTRIBUTOR's failure of performance involves criminal activity, threatens public or private health or safety, involves violent activity or

FLO-MAR0000779

violations of law, or threatens to do substantial harm to COMPANY's business, trademarks or reputation, including, but not limited to, any action or inaction on DISTRIBUTOR's part that results in DISTRIBUTOR's inability to service any Chain account.

17.3    **Curable Breach:**  In any event of failure of performance by DISTRIBUTOR, COMPANY must give DISTRIBUTOR ten (10) business days written notice within which DISTRIBUTOR may cure DISTRIBUTOR's failure of performance.  If DISTRIBUTOR does not cure such failure of performance within this ten (10) day period, COMPANY may thereafter terminate this Agreement and DISTRIBUTOR shall have no further right to cure.  Furthermore, the parties agree that repeated violations, even if cured, constitute a chronic failure of performance and threaten substantial harm to COMPANY's business, trademarks or reputation, and in such event COMPANY shall be entitled to terminate this Agreement immediately and DISTRIBUTOR shall have no further right to cure.

17.4    **Actions Following Termination:**  If this Agreement is terminated under either Section 17.2 or 17.3, COMPANY, within the limits of its ability to do so, will operate the business for the account of DISTRIBUTOR, deducting its reasonable expenses in connection with the operation thereof, and sell DISTRIBUTOR's Distribution Rights to a qualified purchaser(s) at the best price which can reasonably be obtained after proper notice and advertisement.  Such sale shall be for the account of the terminated DISTRIBUTOR, and the proceeds of such sale, after deducting therefrom any monies owed by DISTRIBUTOR to COMPANY, the amount of any outstanding liens, any other known liabilities of the distributorship and the reasonable costs incurred in effecting the sale, shall be turned over to DISTRIBUTOR in exchange for the release of DISTRIBUTOR's Distribution Rights and interests under this Agreement, together with a general release of claims.  COMPANY will concurrently execute a general release of claims as to DISTRIBUTOR, except for any claim for monies due and owing COMPANY.

17.5    **Payment Upon Termination and Sole Remedy:**    DISTRIBUTOR and COMPANY acknowledge that the rights and obligations in this Article, and Sections 3.1(b) and (c) and 16.1 if applicable, shall be DISTRIBUTOR's and COMPANY's sole and exclusive remedy upon any termination pursuant to this Agreement notwithstanding any law, regulation or court decision to the contrary. COMPANY shall not be liable for any loss of profit by DISTRIBUTOR or any part of DISTRIBUTOR's advertising, sales, promotion, organization, capital or business investment. DISTRIBUTOR hereby releases COMPANY from any and all such liability.  COMPANY hereby releases DISTRIBUTOR from any such liability.

FLO-MAR0000780

## XVIII. DISPUTE RESOLUTION

18.1   **Negotiation:** DISTRIBUTOR and COMPANY shall attempt in good faith and employ their best efforts to resolve and terminate any controversy, claim or dispute arising out of or relating to this Agreement promptly by negotiations. Such negotiations shall take place between representatives of COMPANY and DISTRIBUTOR who have the authority to settle and resolve the dispute. Such negotiations shall begin upon written notice from one party to the other describing any dispute or claim which has not been resolved in the ordinary course of business and suggesting a location for a meeting between the parties to conduct such negotiations within ten (10) business days after delivery of such notice. Representatives of DISTRIBUTOR and COMPANY shall meet at a mutually acceptable time and place within ten (10) calendar days after delivery of such notice and thereafter as often as they reasonably deem necessary, to exchange relevant information and to attempt to resolve the dispute. Any such meeting may be attended by one or more representatives of each party. No such meeting shall be attended by an attorney representing either party unless such party shall have first given the other party at least three (3) calendar days' notice that it will be accompanied by an attorney at the next scheduled meeting, and at such meeting the other party may also be accompanied by an attorney.

18.2   **Mediation:** If the dispute has not been resolved within thirty (30) calendar days of the initial notice, or if the party receiving such notice has failed to meet within fifteen (15) calendar days, either party may initiate mediation by a request therefore in writing to the other party. Upon receipt of such notice, DISTRIBUTOR or COMPANY shall be obligated to engage in mediation. If the parties fail to agree within fifteen (15) calendar days of the date of such request for mediation on the selection of a mediator, then the Center for Public Resources shall appoint a mediator in accordance with its Mediation Procedure and the parties shall continue efforts through mediation to resolve the controversy and dispute between them until mediation is terminated by the occurrence of any of the following events:

    (i)   A written resolution in settlement of the dispute is reached, or

    (ii)   The mediator informs the parties in writing that further efforts would not be productive or useful, or

    (iii)   The parties agree in writing that further efforts would not be productive, or

    (iv)   Sixty (60) calendar days elapse from the commencement of the mediation without resolution.

Neither COMPANY nor DISTRIBUTOR may withdraw from mediation before such a termination of the process.

18.3   **Litigation:** If the dispute has not been resolved in accordance with the foregoing within ninety (90) calendar days of the commencement of the negotiation procedure, either party may initiate

FLO-MAR0000781

litigation upon ten (10) calendar days written notice to the other party; provided, however, that if any party has failed to voluntarily participate in the requirements of the foregoing Sections, the other party may initiate litigation before expiration of the ninety (90) day period.

18.4    **Confidentiality:**  All negotiations and mediations pursuant to this Section of the Agreement are confidential and shall be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and any similar state rules of evidence.

18.5    **Tolling:**  All applicable statutes of limitation and defenses based upon the passage of time shall be tolled during the procedures specified in this Section, including those specified in Section 20.3 hereof.  All deadlines specified by this Section may be extended by mutual agreement of the parties.

### X1X.  TRADEMARKS, TRADE NAMES, AND PROPRIETARY MATERIALS

19.1    **Permission for Use:**    Subject to the terms and conditions of this Article 19 and to the Distribution Rights granted herein, for the duration of this Agreement, COMPANY authorizes DISTRIBUTOR to use, on a non-exclusive basis, the trade names and trademarks (collectively, "Trademarks"), trade dress, package designs, logos, artwork, advertising materials and other works protected by copyright, and other intellectual property of or associated with the Products (collectively, including the Trademarks, the "Proprietary Materials") solely in connection with DISTRIBUTOR's advertising, promoting, marketing, sale, and distribution of Products in the Territory.  DISTRIBUTOR may not assign or transfer this authorization except in the context of a sale or transfer of all or a portion of the Distribution Rights as provided in this Agreement. DISTRIBUTOR will not use any of the Proprietary Materials in any manner different from how they are used generally by COMPANY.

19.2    **Conditions of Use:**  DISTRIBUTOR shall make no use of the Trademarks or Proprietary Materials, nor engage in any program or activity which makes use of or contains any reference to COMPANY, its products, Trademarks or Proprietary Materials, other than as specifically provided herein, except with the prior written consent of COMPANY.  Should DISTRIBUTOR advertise other services or products on its delivery vehicle, such advertising shall not dilute or negatively affect the reputation and goodwill of COMPANY or the Trademarks or the Proprietary Materials.   DISTRIBUTOR will not (i) do anything that would or might be inconsistent with, impair, or conflict with ownership of the Proprietary Materials by COMPANY or, if licensed, franchised, or otherwise, the owner thereof; (ii) use any of the Proprietary Materials in any manner likely to (a) deceive or mislead the public, (b) endanger the validity or enforceability of any of the Proprietary Materials, or (c) damage or impair the reputation or value of COMPANY, any of the Proprietary Materials, or any Product; (iii) attack, contest, oppose, or

FLO-MAR0000782

interfere with the right, title, or interest in or to any Proprietary Materials of COMPANY or the owner thereof in any jurisdiction; or (iv) adopt or use any work confusingly or substantially similar to any of the Proprietary Materials. DISTRIBUTOR will not use any of the Trademarks or Proprietary Materials in either its legal or fictitious trade name without the prior written consent of COMPANY. DISTRIBUTOR will not use any of the Trademarks, Proprietary Materials, or any variation thereof as a business name or d/b/a of DISTRIBUTOR, an Internet domain name or a mnemonic, cipher, or "vanity" telephone number without COMPANY's prior written approval.

19.3 **Monitoring and Cooperation:** To insure the uniform quality of the goods in connection with which the Proprietary Materials are used, COMPANY will have the right to require DISTRIBUTOR to immediately discontinue any non-approved use of any Proprietary Materials or any other activity that COMPANY in its sole judgment considers likely to impair the value or validity of the Proprietary Materials. DISTRIBUTOR will immediately observe and require that other persons under its control observe any and all instructions of the COMPANY limiting or halting the use of the Proprietary Materials. DISTRIBUTOR will notify COMPANY, in writing, as soon as DISTRIBUTOR becomes aware of any infringement, imitation, impairment, counterfeiting, or other unlawful or improper use of any of the Proprietary Materials or any of the Products. DISTRIBUTOR will cooperate with and provide testimony and other evidence to COMPANY in and in connection with any application for, registration and protection of, or enforcement of the Proprietary Materials in the Territory as and when requested by COMPANY.

19.4 **Acknowledgment:** DISTRIBUTOR acknowledges and agrees that (i) all the rights concerning the Proprietary Materials are owned by the COMPANY or the owner thereof, (ii) DISTRIBUTOR does not have, and will not as a result of this Agreement or performance hereunder acquire, any ownership or legal rights in any of the Proprietary Materials used in connection with the Products, and (iii) DISTRIBUTOR's sole rights with respect to the Proprietary Materials are set forth in this Article 19.

19.5 **Return Upon Termination:** Upon termination of this Agreement, DISTRIBUTOR shall cease use of COMPANY's Proprietary Materials and shall deliver to COMPANY any advertising, promotional or merchandising material.

## XX. MISCELLANEOUS

20.1 **Notice:** Any notice required or permitted under this Agreement shall be deemed properly given and received on the date received if hand delivered; on the next business day after deposit with a nationally recognized overnight courier service for overnight delivery; or three (3) days after deposited in the mails, return receipt requested, registered or certified mail postage pre-paid,

FLO-MAR0000783

addressed to the parties at the addresses first referenced above, or at such other address as either party may designate by written notice given pursuant to this section.

**20.2**   **Company Breach:**   If DISTRIBUTOR maintains that COMPANY is in breach of this Agreement, DISTRIBUTOR must notify COMPANY President in writing, by certified mail, return receipt requested, within ten (10) calendar days of the occurrence of the alleged breach or, if it is an alleged continuing breach, within thirty (30) calendar days of the first occurrence of the alleged breach.   Such written notice must include the specific section of this Agreement DISTRIBUTOR maintains has been breached and sufficient facts to provide reasonable notice to COMPANY of the action or failure to act which DISTRIBUTOR maintains is a breach of this Agreement.   DISTRIBUTOR's failure to comply with the requirements of this section shall constitute a waiver of such breach or continuing breach.

Upon receipt of the DISTRIBUTOR's notice of breach, COMPANY shall have a reasonable period of time to investigate and cure any breach.

**20.3**   **Statute of Limitations:**   COMPANY and DISTRIBUTOR agree that no legal or equitable claim of any sort shall be commenced or maintained by either party to enforce any liability or obligation of the other party, whether arising from this Agreement or otherwise, unless brought before one (1) year after the date of the first act or omission giving rise to such alleged liability or obligation.

**20.4**   **Survival:**   This agreement shall be binding upon the heirs, personal representatives, successors or assigns of the parties to this Agreement.   Notwithstanding any termination of this Agreement, all provisions hereof that, by their terms or reasonable interpretation thereof, set forth obligations that extend beyond the termination of this Agreement, shall survive and remain in full force and effect.

**20.5**   **Incorporation of Bill of Sale:**   This Agreement is subject to and affected by a Bill of Sale simultaneously executed by the parties, such Bill of Sale being fully incorporated in this Agreement by reference.

**20.6**   **Entire Agreement:**   This Agreement, together with all Exhibits incorporated herein by reference, as amended from time to time in accordance with the Agreement, sets forth the entire agreement between the parties and supersedes all prior agreements, discussions, negotiations, understandings, representations, conditions, warranties and covenants between them with respect to this subject matter.   Unless set forth in this Agreement, no party shall be liable for any representation made to any other.   Except as otherwise expressly authorized herein, this Agreement may be amended or modified only by a writing signed by all parties.   Nor is anything in the Distributor Agreement or any related agreement intended to disclaim the representations made in COMPANY's franchise disclosure agreement.

FLO-MAR0000784

**20.7**   **Indemnification:** DISTRIBUTOR agrees to indemnify and hold harmless COMPANY from and against any and all claims, actions, liabilities, expenses, losses or demands, including reasonable attorneys' fees, growing out of or based upon this Agreement or any acts or omissions of DISTRIBUTOR arising in the normal course of the conduct of business by DISTRIBUTOR pursuant to this Agreement.   DISTRIBUTOR shall also indemnify COMPANY against all liability and loss in connection with, and shall assume full responsibility for, payment of all federal, state and local taxes and/or contributions imposed or required under unemployment insurance, workers' compensation insurance, and income tax laws, with respect to DISTRIBUTOR or DISTRIBUTOR's employees engaged in performance of this Agreement.

**20.8**   **Trade Secrets/Confidential Business Information:**   DISTRIBUTOR recognizes and acknowledges that COMPANY and its related entities have, through the expenditure of substantial time, effort and money, developed and acquired certain trade secrets and confidential business information ("Confidential Information") which are of great value to COMPANY. DISTRIBUTOR further acknowledges and understands that through the distributor relationship with COMPANY, DISTRIBUTOR will have access to Confidential Information of COMPANY and its related entities.   Accordingly, except as and to the extent required by law, DISTRIBUTOR covenants that DISTRIBUTOR will make no disclosure, or any use, in any manner whatsoever, of any Confidential Information of COMPANY and/or any of its related entities while this Agreement is in effect and thereafter, except as specifically authorized by COMPANY. Upon termination of this Agreement, DISTRIBUTOR shall return to COMPANY all embodiments of such Confidential Information that are in DISTRIBUTOR's possession, custody or control. As used herein the term "Confidential Information" include (a) sales data, financial statements and information, marketing arrangements and plans, trade secrets, pricing information and strategies, business development plans, and any other business methods, processes and techniques of COMPANY and/or its related entities to the extent all of which are not generally known to the trade or industry and/or (b) confidential or proprietary information or trade secrets of third parties, including retail customers, with which COMPANY and/or its related entites conducts business and which is supplied to DISTRIBUTOR for purposes of this Agreement.   Notwithstanding the foregoing, Confidential Information shall not include information that: (i) is or becomes generally known to the public not as a result of a disclosure by DISTRIBUTOR; (ii) is received by DISTRIBUTOR in good faith and without restriction from a third party having the right to make such disclosure;  and/or (iii)  is known to DISTRIBUTOR at the time of COMPANY'S disclosure thereof to DISTRIBUTOR or DISTRIBUTOR'S becoming aware thereof in the course of and as a result of DISTRIBUTOR'S business relationship with

FLO-MAR0000785

COMPANY. DISTRIBUTOR's obligations in this paragraph shall be in addition to, and not in lieu of, any and all obligations imposed upon DISTRIBUTOR by applicable law.

20.9     **Injunctive Relief:**  DISTRIBUTOR agrees and acknowledges that a violation of Section 20.8 will cause irreparable harm to COMPANY and that there will be no adequate remedy at law to redress the resulting harm that will be suffered by COMPANY. Therefore, DISTRIBUTOR further agrees that in the event of any violation or threatened violation of this Section, COMPANY shall be entitled as a matter of course to an immediate injunction out of any court of competent jurisdiction restraining such violation or threatened violation by DISTRIBUTOR, such right to be cumulative and in addition to whatever other remedies, at law or in equity, that COMPANY may have.

20.10    **Savings Provision/Non-Waiver:**  Should any portion, word, clause, sentence or paragraph of this Agreement be declared void or unenforceable, such portions shall be modified or deleted in such a manner as to make this Agreement as modified legal and enforceable to the fullest extent permitted under applicable law. Except as expressly provided herein, no waiver by either party of any default in the performance of any part of this Agreement by the other party shall be deemed a waiver of any other default hereunder.

20.11    **Damages:**  Neither party shall be liable to the other for, and each party expressly waives, any consequential, incidental, special, exemplary or punitive damages.

20.12    **Legal Counsel:**  DISTRIBUTOR acknowledges that it has been given a reasonable opportunity to discuss this Agreement with an attorney of its choosing; that it has carefully read and fully understands the provisions of this Agreement, and that it is entering into this Agreement knowingly, voluntarily, and with the intention of being legally bound by all of the terms of this Agreement.

20.13    **Waiver of Jury Trial:**  DISTRIBUTOR AND COMPANY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT, OR ANY PROCEEDING IN ANY WAY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, AND DISTRIBUTOR AND COMPANY AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

FLO-MAR0000786

20.14   **Governing Law and Jurisdiction:** This Agreement and the construction thereof shall be governed by the laws of the State of California, without regard to the conflict-of-law rules, and any dispute arising under this Agreement or relating to the relationship created by this Agreement shall be subject to the exclusive jurisdiction of the federal or state courts of California.

IN WITNESS WHEREOF, COMPANY and DISTRIBUTOR have executed this Agreement this 17th day of April, 2013.

DISTRIBUTOR                                    COMPANY

By                                             By: ___Tom Wilson___

Its: _____                       Its: ___President___

WITNESSES                                      ATTEST

FLO-MAR0000787

## EXHIBIT "A" – TERRITORY

1. Starting at the intersection of East Los Coyotes Diagonal and East Stearns Street, proceed east on East Stearns Street (north side) to Marwick Avenue.
2. North on Marwick Avenue (west side) to Vernon Street.
3. East on Vernon Street or the extension thereof (north side) to Woodruff Avenue.
4. North on Woodruff Avenue (west side) to Willow Street.
5. East on Willow Street (north side) to North Studebaker Road.
6. North on North Studebaker Road (west side) to East Wardlow Road.
7. East on East Wardlow Road (north side) to Interstate 605.
8. North on Interstate 605 (west side) to Del Amo Boulevard.
9. West on Del Amo Boulevard (south side) to Palo Verde Avenue.
10. North on Palo Verde Avenue (west side) to South Street.
11. West on South Street (south side) to Woodruff Avenue
12. South on Woodruff Avenue (east side) to Centralia Street
13. East on Centralia Street (north side) to Palo Verde Avenue
14. South on Pale Verde Avenue (east side) to East Metz Street
15. Northwest on East Metz Street (south side) to North Los Coyotes Diagonal.
16. Southwest on North Los Coyotes Diagonal (east side) to East Stearns Street and the beginning.

FLO-MAR0000788

## EXHIBIT "B" – PRODUCTS

Except as expressly limited by the Distributor Agreement, DISTRIBUTOR shall have the exclusive right to sell and distribute the following Products in the Territory specifically described in Exhibit A.

1. Nature's Own

2. Aunt Hattie's

3. Frestillas

4. Blue Bird

5. DISTRIBUTOR shall also have the exclusive right to sell and distribute in the Territory those Products set forth in Sublicensing Agreement executed concurrently herewith, subject to all the terms and  conditions set forth in the Sublicensing Agreement and the Intellectual Property License Agreement for the California Area referenced therein.

FLO-MAR0000789

## EXHIBIT "C" – AUTHORIZED PRODUCTS

Except as expressly limited by the Distributor Agreement, DISTRIBUTOR is authorized to distribute the following products. Authorized Products may include products with logos and/or labels, or without. DISTRIBUTOR does not acquire any proprietary or ownership rights to such Authorized Products, exclusive or non-exclusive, and COMPANY may cease selling such Authorized Products to DISTRIBUTOR upon notice. COMPANY may also add Authorized Products to this Exhibit upon notice to DISTRIBUTOR.

1. Kirkland

2. Royal Hearth

3. Rich Harvest

4. Great Value

5. Homestyle

6. Gallaso

7. Town Talk

8. Fiesta Farms

FLO-MAR0000790

## EXHIBIT "D" – BILL OF SALE

Flowers Baking Co. Of California, LLC, ("COMPANY"), subject to the consideration set forth below, effective the 22nd day of April, 2013, hereby conveys, sells, transfers and delivers to Giovanni Martinez, ("DISTRIBUTOR"), the Distribution Rights specifically described in the Distributor Agreement executed simultaneously with this Bill of Sale. Both the Distributor Agreement and all appendices (exhibits) thereto are specifically incorporated into and made a part of this Bill of Sale.

The terms of this sale are as follows:

Purchase price shall be $113,079.00.

DISTRIBUTOR shall own all Distribution Rights in the Territory in himself/herself/itself and in DISTRIBUTOR's executors, administrators and assigns, consistent with the terms and conditions contained in the Distributor Agreement and the Sublicensing Agreement executed concurrently therewith.

COMPANY has lawful title to the Distribution Rights in the Territory free from all encumbrances. COMPANY warrants and will defend the rights conveyed herein against the lawful claims and demands of all persons.

IN WITNESS WHEREOF, COMPANY and DISTRIBUTOR execute this Bill of Sale this 17th day of April, 2013.

DISTRIBUTOR

By: _____

Its: _____

COMPANY

By: _____PRESIDENT_____

Its: _____

Tom Wilson

WITNESSES

_____

_____

ATTEST _____

FLO-MAR0000791

## EXHIBIT "E" – OWNER

Name:              Giovanni Martinez

Address:           123 Poinsettia Ave

City, State, ZIP   Monrovia, CA.  91016

FLO-MAR0000792

## EXHIBIT "F" – PERSONAL GUARANTY

In consideration of the foregoing premises, covenants and conditions, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Giovanni Martinez, an individual ("Guarantor"), does hereby irrevocably and unconditionally guarantee to COMPANY, and become surety to COMPANY, for the performance and compliance with the terms, conditions and obligations of this Distributor Agreement entered into by and between Giovanni Martinez, a California corporation ("DISTRIBUTOR"), and COMPANY. If any term, condition or obligation of the Distributor Agreement is not complied with, performed, or paid by DISTRIBUTOR as required therein, including any terms, conditions or obligations due following termination thereof, the Guarantor will, upon COMPANY's demand, immediately perform, comply with or pay any amounts due and owing due to DISTRIBUTOR's breach of the Distributor Agreement or as required by the terms and conditions thereof. Guarantor shall also pay to COMPANY upon demand all costs and expenses, including but not limited to reasonable attorney fees, which may be incurred by COMPANY in the enforcement and/or collection of monies due hereunder.

Giovanni Martinez, an individual  4/17/13 Date

WITNESSES

FLO-MAR0000793

**ADDENDUM**

The following agreement is entered into as a supplement to the Distributor Agreement between <u>Giovanni Martinez</u> (DISTRIBUTOR) and <u>Flowers Baking Co. Of California, LLC</u> (COMPANY). Notwithstanding any other provision contained in the Distributor Agreement, the parties hereby agree as follows:

(1)    At any time within six (6) months and one (1) day of the effective date of the Distributor Agreement, should DISTRIBUTOR decide it no longer desires to own the Distribution Rights, then, if DISTRIBUTOR provides thirty (30) calendar days written notice, COMPANY will buy back the Distribution Rights from DISTRIBUTOR. DISTRIBUTOR's obligations under the Distributor Agreement shall continue until the Distribution Rights are repurchased.

(2)    In the event DISTRIBUTOR exercises this option, the purchase price of the Distribution Rights will be an amount equal to the amount DISTRIBUTOR paid COMPANY for such Distribution Rights.

(3)    Provided the vehicle is in usable condition, COMPANY also agrees to purchase the truck purchased by DISTRIBUTOR from COMPANY at the lesser of DISTRIBUTOR's purchase price or an amount determined by an independent appraiser. In the event DISTRIBUTOR has leased a vehicle for use in connection with the Distributor Agreement and has done so under commercially reasonable circumstances, then COMPANY will assume, and relieve DISTRIBUTOR of, any obligation under said lease.

(4)    Except as provided in this Addendum, the parties retain any and all rights set forth in the Distributor Agreement.

DISTRIBUTOR

By: _____

Its: _____

Date: 4/17/13

COMPANY

By: Tom Wilson

Its: President

Date: 6/28/13

WITNESSES

ATTEST

FLO-MAR0000794

## SUBLICENSING AGREEMENT

This Sublicensing Agreement ("Agreement") is made effective the 22nd day of April, 2013, by and between Flowers Baking Co. of California, LLC, a California limited liability company with officers and its principal place of business at 10625 Poplar Avenue, Fontana, California 92237 (herein "COMPANY") and Giovanni Martinez, a California corporation, with its principal place of business at 123 Poinsettia Ave, Monrovia, CA. 91016 (herein "DISTRIBUTOR").

### WITNESSETH:

Whereas, COMPANY has been granted a sublicenseable and transferrable license to distribute, market, promote, advertise, and sell certain bakery Products (as defined herein) under certain Marks (as also defined herein) pursuant to an Intellectual Property License Agreement for the California Area ("Intellectual Property License Agreement") with Grupo Bimbo, S.R.B. de C.V. and Earthgrains Bakery Group, Inc. ("Licensors");

Whereas, the aforementioned Intellectual Property License Agreement permits COMPANY to assign its rights under the Agreement to DISTRIBUTOR under certain terms and conditions;

Whereas, DISTRIBUTOR is an independent contractor with the resources, expertise and capability to act as a distributor of COMPANY for the aforementioned Products;

Now, therefore, in consideration of these premises, and of the covenants and conditions contained in this Agreement, and for good and valuable consideration given and received, the receipt and the sufficiency of which are hereby specifically agreed to and acknowledged, the parties mutually agree as follows:

### I. DEFINITIONS

1.1     **Marks:** Shall mean the Trademarks identified on Schedule A hereto, which Schedule may be amended by COMPANY from time to time to add new Trademarks or delete old Trademarks.

1.2     **Products:** Shall mean fresh, bagged, sliced bread, and items sold as bagged buns, rolls, thin rolls, thin buns (e.g., Sandwich Thins®-type products) and other fresh bread products, in each case sold under the Marks in the Territory, and excludes English muffins, bagels, and flat bread sold as traditional pita bread.

1.3     **Territory:** Shall mean that geographical area specifically described in the Distributor Agreement executed contemporaneously hereto by the parties.

1.4     **Trademarks:** Shall mean U.S. and foreign registered and unregistered trademarks, trade dress, service marks, logos,  trade names, certification marks, slogans, corporate names and all

FLO-MAR0000795

registrations and applications to register the same, and the goodwill associated with any of the foregoing.

## II.  GRANT OF SUBLICENSE

**2.1**     In accordance with the aforementioned Intellectual Property License Agreement, and subject to all terms and conditions set forth therein, COMPANY hereby assigns DISTRIBUTOR the exclusive right to sell and distribute Products in the Territory.  DISTRIBUTOR shall sell and distribute such Products in accordance with the good industry practice obligations contained in the Distributor Agreement.

**2.2**     DISTRIBUTOR shall not sell or distribute, on behalf of COMPANY, any Products, either directly or indirectly, outside of the Territory and shall take commercially reasonable steps to prevent distribution of the Products outside of the Territory, directly or indirectly, by DISTRIBUTOR or any of its respective agents or employees.

**2.3**     Licensors and/or COMPANY, or their authorized representatives, shall have access, upon reasonable notice and during regular business hours, to DISTRIBUTOR's facilities in order to inspect DISTRIBUTOR's packaging or distribution methods for the Products and to inspect and take samples of any packaging, wrappers, boxes or labels being used by DISTRIBUTOR to package or distribute the Products.

**2.4**     DISTRIBUTOR shall comply with the packaging and labeling standards and specifications set forth in the Intellectual Property License Agreement or those reasonably specified by Licensors from time to time in accordance with the terms of the said Agreement.

**2.5**     Any deficiencies in the packaging, labels or other materials used for or on the Products shall, at COMPANY's option, be destroyed at the expense of DISTRIBUTOR, or returned to COMPANY and destroyed.

**2.6**     DISTRIBUTOR shall be bound by the obligations of confidentiality equivalent to those imposed on the parties pursuant to the Intellectual Property License Agreement, which obligations are set forth in Schedule B hereto;

**2.7**     DISTRIBUTOR shall, in packaging or distributing the Products, comply with all applicable local, state and federal laws and regulations.

**2.8**     DISTRIBUTOR acknowledges Licensors' exclusive ownership and/or exclusive rights of the Marks, will not challenge the Marks and agrees that all use of the Marks by DISTRIBUTOR in packaging or distributing the Products shall inure to the benefit of the applicable owners or licensees of the Marks.

FLO-MAR0000796

2.9     DISTRIBUTOR shall not use the Marks in any manner whatsoever except to package, label or distribute the Products in the Territory and shall not package or distribute any other product bearing the Marks or otherwise display or use the Marks or any portion thereof or any other Trademarks confusingly similar thereto on the packaging or labeling for any other product.

2.10    DISTRIBUTOR specifically acknowledges that the only rights it has obtained under this Agreement are those specifically authorized to be sublicensed by COMPANY and in accordance with the Intellectual Property License Agreement and that such rights are otherwise subject to all applicable provisions of the Distributor Agreement including, but not limited to, those provisions regarding the extent and duration of the distribution rights which encompass the sublicense rights hereunder.

### III.  TRANSFER OR SALE OF RIGHTS

The sublicense rights hereunder may be transferred or sold by DISTRIBUTOR, subject to prior written approval of COMPANY, which approval shall not be unreasonably withheld.  Any such transfer or sale shall be subject to the other terms and conditions set forth in Article XV of the Distributor Agreement.

IN WITNESS WHEREOF, COMPANY and DISTRIBUTOR have executed this Agreement this 17th day of April, 2013.

DISTRIBUTOR

By: _____

Its: _____

COMPANY

By: ___ Tom wilson ___

Its: ___ President ___

WITNESSES

_____

_____

ATTEST

_____

FLO-MAR0000797

## SCHEDULE A – MARKS

1.  Sara Lee

2.  Earthgrains

FLO-MAR0000798

## SCHEDULE B – CONFIDENTIAL INFORMATION

As a result of this Agreement, the parties may exchange certain information not available to the general public regarding each party's business, including, but not limited to, all proprietary, technical, business, marketing, sales and other information related to each party's business (the "Confidential Information"); provided, however, that the term "Confidential Information" shall not include any information that:

(a)     is or becomes generally available to the public other than as a result of a disclosure by the receiving party or its Related Parties (as defined below);

(b)     is in the lawful possession of the receiving party or becomes available to the receiving party from a source other than the originating party, which source is not prohibited from disclosing such information because of a contractual, legal or fiduciary obligation to the originating party; or

(c)     is independently developed by the receiving party.

For purposes of this Agreement, the originating party shall be defined as the party who provided the Confidential Information to the other party and the receiving party is the party who is provided such Confidential Information.  For the avoidance of doubt, the terms and conditions of this Agreement shall be considered Confidential Information to the extent that they have not been made generally available to the public in connection with the Final Judgment or in connection with any other legal, administrative or regulatory requirements.

The Confidential Information shall be kept confidential and shall not, without the prior written consent of the originating party, be disclosed by the receiving party or by its directors, officers, agents, representatives, employees or Affiliates (collectively referred to as the "Related Parties") in any manner whatsoever and shall not be used by the receiving party or its Related Parties other than in connection with such party's obligations under this Agreement.  Moreover, the receiving party agrees to reveal Confidential Information only to its Related Parties who need to know the Confidential Information for the purpose of fulfilling such party's obligations hereunder and who are informed of the confidential nature of the Confidential Information and the terms of this Agreement.  Each party hereto shall be solely responsible for any breach of this Agreement by its Related Parties.  Either party may disclose the Confidential Information to its bankers, attorneys and accountants, as necessary, subject to comparable confidentiality obligations imposed herein.

In the event that the receiving party or anyone to whom it transmits the Confidential Information pursuant to the terms of this Agreement becomes legally compelled (by deposition, interrogatory, request

FLO-MAR0000799

for documents, subpoena, civil investigative demand or similar process) to disclose any of the Confidential Information, the receiving party will provide the originating party with prompt notice so that it may seek a protective order or other appropriate remedy or waive compliance with this Section of the Agreement. In any case, the receiving party will furnish only that portion of the Confidential Information which it is advised by written opinion of its legal counsel is legally required to be furnished and will use its commercially reasonable best efforts to obtain a protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information. The receiving party shall have no responsibility or liability to the originating party for disclosure of Confidential Information made in compliance with this Section.

The receiving party acknowledges and agrees that the Confidential Information to be disclosed to it hereunder may be of a unique character and that the breach of these confidentiality provisions shall cause the originating party irreparable injury and damage; and consequently, the originating party shall be entitled, in addition to all other remedies available to it, to injunctive and equitable relief to prevent a breach hereof and to secure compliance hereto. In the event that the non-breaching party seeks injunctive relief or specific performance, the breaching party agrees that the non-breaching party shall not be required to post a bond or other security.

FLO-MAR0000800

## ADDENDUM TO EXHIBIT C – AUTHORIZED PRODUCTS

In accordance with Section 2.3 of the Distributor Agreement by and between <u>Flowers Baking Co. of California, LLC</u> ("COMPANY") and <u>GNA DISTRIBUTING INC</u> ("DISTRIBUTOR"), COMPANY hereby amends Exhibit C thereto to include the following Authorized Product(s), effective <u>September 23, 2013</u>:

    1.    Wonder

    2.    HomePride

As stated in Section 2.3 of the Distributor Agreement, DISTRIBUTOR does not acquire any proprietary or ownership rights to such Authorized Products, exclusive or non-exclusive. COMPANAY may cease selling such Authorized Products to DISTRIBUTOR upon notice, with or without cause. DISTRIBUTOR's rights and obligations with respect to the above listed Authorized Product(s) are provided for in the DISTRIBUTOR AGREEMENT and/or any subsequent Addenda.

**Although DISTRIBUTOR does not acquire any proprietary or ownership rights to the above referenced Authorized Product(s), COMPANY hereby agrees that should COMPANY decide to cease selling the above referenced Authorized Product(s) to DISTRIBUTOR, COMPANY will pay to DISTRIBUTOR an amount equal to thirteen (13) times the average weekly sales of such Authorized Products, averaged over the 26 week period prior to such action.**

COMPANY

By: _____

Its: _____President_____

Date: _____9/18/13_____

FLO-MAR0000804

## ASSIGNMENT AND ASSUMPTION AGREEMENT

ASSIGNMENT AND ASSUMPTION AGREEMENT ("Assignment"), made and entered into as of the **23rd** day of **February 2014**, by and between **Flowers Baking Co. of California, LLC** (hereinafter referred to as "Assignor"), and **Flowers Baking Co. of Henderson, LLC** (hereinafter referred to as "Assignee").

WITNESSETH:

WHEREAS, the Assignor is a party to those certain agreements (more particularly described in Exhibit A attached hereto and made a part hereof) and any amendments and accompanying instruments thereto (hereinafter collectively referred to as the "Distributor Agreements"); and

WHEREAS, the Assignor now desires to assign to the Assignee, and the Assignee desires to take by assignment, all of the Assignor's right, title and interest in, to and under the Distributor Agreements;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Assignor and the Assignee hereby agree as follows:

1.    ASSIGNMENT.  Effective as of the date hereof, the Assignor hereby assigns, transfers, sets over and conveys to the Assignee, its successors and assigns, all of the Assignor's right, title and interest in, to and under the Distributor Agreements; and

2.    ASSUMPTION BY ASSIGNMENT.  From and after the date hereof, the Assignee hereby undertakes, assumes and agrees to perform, pay and discharge all of the Assignor's obligations and liabilities under the Distributor Agreements.

IN WITNESS WHEREOF, the undersigned have caused this Assignment to be executed on the date first above written.

**Flowers Baking Co. of California, LLC**
Assignor

By: _____

Its: _____

WITNESS:

_____


**Flowers Baking Co. of Henderson, LLC**
Assignee

By: _____

Its: _____

WITNESS:

_____

## EXHIBIT A

| Distributor Name | | | Distributor Agreement Date |
|---|---|---|---|
| Simon | Goro | | October 14, 2013 |
| Victor | Sevilla | | April 15, 2013 |
| Aulbert E. | Ludlow | | March 25, 2013 |
| Andrew | Nelson | AJ Bread & Buns, Inc. | April 22, 2013 |
| Rafeal | Prado | | April 8, 2013 |
| James | King | | April 15, 2013 |
| Rodolfo R | Arroyo | | June 24, 2013 |
| Tony | Russell | | April 15, 2013 |
| Victor J. | Asaro | Vic's Distributing, Inc. | March 11, 2013 |
| Victor J. | Asaro | Vic's Distributing, Inc. | April 29, 2013 |
| Giuseppe | Zizzo | | April 8, 2013 |
| Mauricio | Magdaleno | | March 11, 2013 |
| Salvador C. | Gonzalez | Gonzalez & Jaime Distributors, Inc | March 11, 2013 |
| Brian | Ochaba | | October 14, 2013 |
| Jose | Pena | | June 24, 2013 |
| David | Castaneda | | March 11, 2013 |
| Jerry | Balelo | | October 14, 2013 |
| Jorge | Franco | Bombins, Inc | April 29, 2013 |
| Boyd | Fleischer | | October 14, 2013 |
| David | Cuen | David Cuen Distributions Inc | May 6, 2013 |
| Rey | Pena | | June 24, 2013 |
| Jon A. | Nelson | | March 11, 2013 |
| Scott A. | Murrie | Murrie Distributing | March 11, 2013 |
| Juan | Meza | Meza Distributing, Inc. | August 19, 2013 |
| Juan | Meza | Meza Distributing, Inc. | February 2, 2014 |
| Dale | North | DBO Distribution, Inc. | April 8, 2013 |
| Danny | Ludlow | | April 8, 2013 |
| William | Lancaster | | March 11, 2013 |
| Shane | Ludlow | Ludz Dough Co. | March 11, 2013 |
| Juan M. | Meza | Meza Distributing | March 11, 2013 |
| Clarence | Mauhili | | August 19, 2013 |
| Alejandro | Flores | | February 2, 2014 |
| Rich | Gough | The Bread Guy, Inc. | April 15, 2013 |
| Steve | Awrey | | April 22, 2013 |
| Sergio F | Aguirre | John 3:16 Breads Inc. | April 22, 2013 |
| Humberto | Lopez | | June 24, 2013 |
| Richard | Blount II | Blount Distributing, Inc. | April 22, 2013 |
| Jeremiah | Montanez | | April 8, 2013 |
| Jeffrey S. | Belander | | March 18, 2013 |
| Manuel | Ruiz | | April 22, 2013 |
| Jesse | Zuniga | | April 8, 2013 |
| David | Bolivar | | March 11, 2013 |

CONFIDENTIAL

FLO-MAR0000808

| | | | |
|---|---|---|---|
| Mauricio | Hernandez | | March 11, 2013 |
| David | Bolivar | | March 11, 2013 |
| Anthony | Aguilar | Ruben Aguilar Inc | May 13, 2013 |
| James | Bryce | All Me Inc | March 11, 2013 |
| Gilbert | Bowser | | May 13, 2013 |
| Ben | Jimenez | D & R Fresh Baking, Inc | May 13, 2013 |
| Jose | Medina | | May 13, 2013 |
| Charles | Lavrusky | Nack Foods, Inc | May 13, 2013 |
| Chris | McPeck | Breadnbuns Inc | March 11, 2013 |
| George | Vitko | High Desert Bread Distribution Incorporated | May 13, 2013 |
| Mike | Ardito | Ardito Distribution Inc. | May 13, 2013 |
| Michael | Caffee | A.D. Distribution, Inc. | May 13, 2013 |
| Tim | Rosenthal | TCR Distribution, Inc. | May 13, 2013 |
| Bruce | Hauck | | May 13, 2013 |
| Chris | McPeck | Breadnbuns Inc | March 11, 2013 |
| Chris | McPeck | Breadnbuns Inc | March 11, 2013 |
| Steven | Ortiz | Stevan Cake Distribution Corp | May 13, 2013 |
| April | Davis | Bundle of 8 | May 13, 2013 |
| Chris | McPeck | Breadnbuns Inc | March 11, 2013 |
| Edgar | Valdez | | May 13, 2013 |
| Marco | Gonzales | Sell Bread Make Dough Inc. | May 13, 2013 |
| Jerry | Hunter | Eagle One Inc. | May 13, 2013 |
| Davin A | Reyes | | June 24, 2013 |
| Ryan J. | Duchsherer | | March 11, 2013 |
| Griselda | Gonzales | Flour & Water Corp. | May 13, 2013 |
| Frank | Bravo | | July 29, 2013 |
| Chester | Ng | Bread Pl8 | December 23, 2013 |
| Nery | Leiva | Nery Leiva Inc. | March 11, 2013 |
| Joseph | Estrada | | May 13, 2013 |
| Robert | Holguin | Holguin Distribution Inc. | May 13, 2013 |
| Himbler | Aviles | Himbler Investments Inc. | March 11, 2013 |
| Marco | Gonzales | Sell Bread Make Dough Inc. | December 9, 2013 |
| Isidoro | Valdez | Izzy's Bakery Corp | May 13, 2013 |
| Roger | Weber II | | March 11, 2013 |
| Michael | Garcia | | June 24, 2013 |
| Britt | Kimble | BK Distribution, Inc | March 11, 2013 |
| Sabrina | Soria | Jede Marie Distribution, Inc. | May 13, 2013 |
| Britt | Kimble | BK Distribution, Inc | March 11, 2013 |
| Britt | Kimble | BK Distribution, Inc | March 11, 2013 |
| William | Clark | William Clark Distributor Inc. | March 18, 2013 |
| Lloyd | DeLong Jr. | Team Delong Enterprises, Inc. | March 11, 2013 |
| Himbler | Aviles | Himbler Investments Inc. | March 11, 2013 |
| John Newton | Fanning | JSB Distributimg Incorporated | May 27, 2013 |
| Paul | Neale | PD&B Distribution, Inc. | May 13, 2013 |
| Edward J. | Morrison | | March 11, 2013 |

FLO-MAR0000809

| | | | |
|---|---|---|---|
| Edward J. | Morrison | | March 11, 2013 |
| Edward J. | Morrison | | March 11, 2013 |
| Edward J. | Morrison | | March 11, 2013 |
| Jodi | Paul | | March 11, 2013 |
| Del | Montagne | | May 13, 2013 |
| Isidoro | Valdez | Izzy's Bakery Corp. | December 23, 2013 |
| Britt | Kimble | BK Distribution, Inc | March 11, 2013 |
| David W. | Kimble | | March 11, 2013 |
| David W. | Kimble | | March 11, 2013 |
| Kristina | McGinnis | | October 14, 2013 |
| Moises | Martin | MLM Distributors, Inc. | May 13, 2013 |
| Donato | Santiago | | May 13, 2013 |
| George | McGowan | CKE Distributors, Inc. | May 13, 2013 |
| Patrick | McCann | Patrick McCann | May 13, 2013 |
| Cecil | Carlton | Halo West Enterprises, Inc. | May 13, 2013 |
| Mark | Sullivan | | March 11, 2013 |
| Ray | Kong | Bread Winner Distribution, Inc. | May 13, 2013 |
| Brandon | Lovett | Rawr Logistics, Inc. | May 27, 2013 |
| Mark | Sullivan | | March 11, 2013 |
| John | Morton | JWM Distributor Inc. | May 13, 2013 |
| William | Valentine | BV Distribution | May 13, 2013 |
| Armando Jr. | Segura | | May 13, 2013 |
| Laura | Weber | | March 11, 2013 |
| James | Falciani | | May 13, 2013 |
| Laura | Weber | | March 18, 2013 |
| Armando | Segura | A & I Segura Distribution | March 11, 2013 |
| Keith | Lovell | | August 19, 2013 |
| Esteban | Ruíz | | May 13, 2013 |
| Joe | Cuadras | | May 20, 2013 |
| Mark | Aviles | Aviles Distributing, Inc. | May 27, 2013 |
| Gregory | Ingoglia | Ingoglia Distribution | May 20, 2013 |
| Ruben | Romero | | May 20, 2013 |
| Gabriel | Fierro | | May 13, 2013 |
| Mike | Wilk | M & R Distribution | May 13, 2013 |
| Mario | Garcia | | May 13, 2013 |
| Sean | French | | May 13, 2013 |
| Eric | Calhoon | | May 20, 2013 |
| Michael | Requejo | One  Loaf Distribution, Inc | May 13, 2013 |
| Miguel | Sanchez | | May 13, 2013 |
| Carlos | Garcia | | May 13, 2013 |
| Gary | Hayes | | May 13, 2013 |
| Sterling | Usher | | May 13, 2013 |
| Matthew | Bruers | | May 13, 2013 |
| Manuel | Marquez | | May 13, 2013 |
| Mathew | Blehm | Ehrhardt Inc | May 13, 2013 |
| Jason Lee | Lewis | | October 14, 2013 |

CONFIDENTIAL

| William | Ailes | C & S Distribution Inc | June 3, 2013 |
| Marcos | Ornelas | | May 13, 2013 |
| Terry | Young | | May 13, 2013 |
| Larry | Lundvall | | March 11, 2013 |
| Larry | Lundvall | | March 11, 2013 |
| Larry | Lundvall | | March 11, 2013 |
| Larry | Lundvall | | March 11, 2013 |
| Bryan | Milam | | May 13, 2013 |
| Rudy | Flores | Flower Power Family, Inc. | May 13, 2013 |
| Martin | Lazcano | | May 13, 2013 |
| Jeff | Tactacan | J.T. Investments | May 13, 2013 |
| Aladin | Beltran | Beltran Investment | May 13, 2013 |
| Robert | Jimenez | Jimenez Distribution, Inc. | May 13, 2013 |
| Narcisco | Arocho | N Arocho Distribution Co Inc | May 13, 2013 |
| Juan | Ocampo | JEBC Inc | May 13, 2013 |
| Ernesto | Lopez | L.B.C. Distribution Inc. | May 13, 2013 |
| Juan | Valenzuela | Valenzuela Distribution Company Inc | May 13, 2013 |
| Giovanni | Martinez | GNA Distributing Inc | April 22, 2013 |
| Joe | Reyes | | May 13, 2013 |
| Edward | Smith | Smith O'Leary Corp | March 11, 2013 |
| Richard | Munoz | JAM Baking Distributor Inc | May 13, 2013 |
| Anthony | Talavera | A & A Distributors, Inc. | May 13, 2013 |
| Donal | Byrd | Byrd Byrd & Byrd Inc | May 13, 2013 |
| Gerald | James | GEEZ Inc. | May 13, 2013 |
| Jose | Almendariz | Almendariz Inc. | April 15, 2013 |
| Victor | Castillo | Pannero Distributing Inc | May 13, 2013 |
| Christian | Ortiz | Ortiz Distribution Inc | May 13, 2013 |
| Santiago | Barraza | MAJ Distribution Inc | May 13, 2013 |
| Juan | Merida | Lots of Buns Corporation | May 13, 2013 |
| Enoc | Guerrero | E & S Grains 1 Inc. | May 13, 2013 |
| Phutane | Mohan | N & N Corporation | May 13, 2013 |
| Mario | Hernandez | MMBN Inc | May 13, 2013 |
| Jose | Almendariz | Almendariz Inc. | April 15, 2013 |
| Daniel | Medina | My Two Boys Bread Delivery Corporation | May 13, 2013 |
| Josue | Melendez | The Rising Bun, Inc. | April 22, 2013 |
| Samuel A | Falcon | | March 11, 2013 |
| Cary | Johnson | Neal and Jean Enterprises Inc | May 13, 2013 |
| Rocen | Keeton | Keeton Distributors Inc | June 24, 2013 |
| Michael | Martinson | MJ Distribution, Inc. | April 22, 2013 |
| Michael | Henderson | Henderson Baking 101 Inc | June 3, 2013 |
| Timothy | Campbell | Campbells Crusts Distribution Inc | March 11, 2013 |
| William | Clark | William Clark Distributor Inc. | March 11, 2013 |
| Eric | Mahan | | May 13, 2013 |
| Patrick | Dwyer | Dwyer Bread & Cake Dist Inc | May 13, 2013 |
| John | Ruiz | John Ruiz Industries, Inc. | May 13, 2013 |
| Sergio | Flores | A&A Flores Distribution Inc | May 13, 2013 |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| Arnulfo | Urena | Nata Inc | May 13, 2013 |
| Fernando | Flores | A Peanuts Distribution Inc | May 13, 2013 |
| Hector | Melendez | Melendez Corp Inc | May 13, 2013 |
| Timothy | Campbell | Campbells Crusts Distribution Inc | March 11, 2013 |
| Eleazar | Canales | J.E.L. Inc | March 11, 2013 |
| Charles | Jose | JJ & MJ Deliveres Inc. | May 13, 2013 |
| Jose | Hernandez | Freshpoint Distribution, Inc | May 13, 2013 |
| Tracy | Speights | T K Speights Inc. | May 13, 2013 |
| Robert E. | Rodriguez | Rodriguez Distributing, Inc | March 11, 2013 |
| Conrado | Gomez | Bips Enterprise Global, Inc. | March 11, 2013 |
| Len | Schneider | Schneider Distributor Corp. | May 13, 2013 |
| Martin | Salazar | Zar Services Inc. | April 15, 2013 |
| Martin | Salazar | Zar Services Inc. | April 15, 2013 |
| Robert | Rafay | R&R Distributing, Inc | May 13, 2013 |
| Carlos | Luna | | May 13, 2013 |
| Douglas | Fullerton | | March 11, 2013 |
| Chris "John" | Thorndike | | March 11, 2013 |
| Luis | Robles | | May 13, 2013 |
| Chris "John" | Thorndike | | March 11, 2013 |
| Darren | McNeil | | May 13, 2013 |
| Micheal | McNeil | | May 13, 2013 |
| Eduardo | Figueroa | | May 13, 2013 |
| Thomas | Doyle | Original Dough Boy Corp. | May 13, 2013 |
| Luis | Gonzalez | LG'S Bread Corporation | May 13, 2013 |
| Andrew | Fitzgerald | Dough Boy Distributions, Inc. | May 13, 2013 |
| Ryan | Engstrom | Engstrom Incorporated | May 13, 2013 |
| Roger | Rydell | | March 11, 2013 |
| Roger | Rydell | | March 11, 2013 |
| Eduardo | Gonzalez | HolsumFlo Corporation | May 13, 2013 |
| Roger | Rydell | | March 11, 2013 |
| Daniel | Hassan | Rising Bread Inc. | May 13, 2013 |
| Salvador | Gomez | G & I Distributors Inc. | March 11, 2013 |
| John | Fontana | RUBY Distribution Corp | May 13, 2013 |
| Adrian | Medina | A M Distribution Incorporated | May 13, 2013 |
| Mike | Plante | M.P. Breadline | May 27, 2013 |
| Paul | Navarro | | May 13, 2013 |
| Oscar | Gonzalez | | December 23, 2013 |
| Kenneth | Johnson | RubKens Inc. | December 23, 2013 |
| Rodrigo | Guardado | | October 14, 2013 |
| Joel | Hendrickson | Joel Hendrickson Inc. | May 13, 2013 |
| Set | Guerrero | | June 3, 2013 |
| Carlos | Guevara | | December 23, 2013 |
| Scott | Hudson | BSH Distributing Inc. | May 13, 2013 |
| Nicolas | Navarro | | June 3, 2013 |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| Sergio | Alvarez | PJJ Distribution Inc. | May 13, 2013 |
| Paul Joshua | Navarro III | | May 27, 2013 |
| Michael | Santillan | | May 27, 2013 |
| Alfredo | Lopez | Daily Bread Distribution | May 13, 2013 |
| Kent | Aldrich | Kent Hoyt Inc. | May 13, 2013 |
| Fernando | Hernandez | GEE Snacks Inc. | July 29, 2013 |
| Steven | Sawicki | | July 29, 2013 |
| Tatiana | Zepada | | May 27, 2013 |
| Christian | Bailon | | June 24, 2013 |
| Jorge | Casas | | June 24, 2013 |
| Maxwell R | Ming | | June 24, 2013 |
| Scott A. | Cash | Cash's Bread and Distribution Inc | October 14, 2013 |
| Erik D. | Melero | Melero Inc | June 3, 2013 |
| Thomas L. | Farris | STC Inc | June 3, 2013 |
| Takio | Trumpf | Trumpf Inc | June 3, 2013 |
| Javier Zavala | Garcia | Zavala-Garcia Corp | June 3, 2013 |
| Jan | Phillips | Janny P's Tasty Bakes | July 29, 2013 |
| Phillip J | Antoine Jr | Global Synergy Group Inc. | June 24, 2013 |
| Luis | Ramirez | | June 3, 2013 |
| Stuart | Detherage | | June 3, 2013 |
| Jerome | Schroeder | Derek & Dylan Dist Inc. | June 3, 2013 |
| Merce | Ramos | | June 3, 2013 |
| Jeffery | Hilliard | | June 3, 2013 |
| Jeffery | Dawson | | June 3, 2013 |
| Adam | Sotelo | | July 29, 2013 |
| Robert | Reiter | | March 11, 2013 |
| Charles | Dornbusch | Dornbusch Distributing, Inc. | August 19, 2013 |

CONFIDENTIAL

## ADDENDUM TO BILL OF SALE

**Flowers Baking Co. of Henderson, LLC**, COMPANY, subject to the consideration set forth below, hereby conveys, sells, transfers and delivers to **GNA Distributing Inc**, DISTRIBUTOR, the Distribution Rights specifically described in the Amendment to Exhibit B of the Distributor Agreement executed herewith. The Distributor Agreement and all exhibits, appendices and addenda thereto are specifically incorporated into and made a part of this Addendum to Bill of Sale.

The terms of this sale are as follows:

Consistent with the terms and provisions of the Distributor Agreement, DISTRIBUTOR agrees hereinafter to assume and carry out the obligations associated with the development and maintenance of the products sold under the trademark(s) listed on Amendment to Exhibit B attached hereto.

DISTRIBUTOR shall own all Distribution Rights described above in himself/itself and in his executors, administrators and assigns, consistent with the terms and conditions contained in the Distributor Agreement.

COMPANY has lawful title to the Distribution Rights in the Territory free from all encumbrances. COMPANY warrants and will defend the rights conveyed herein against the lawful claims and demands of all persons.

IN WITNESS WHEREOF, COMPANY and DISTRIBUTOR execute this Agreement this 28th day of March, 2014.

DISTRIBUTOR

By: Giovanni Martinez

Its: President

WITNESSES:

COMPANY

By: Tom Wilson

Its: President

Attest:

FLO-MAR0000814

## AMENDMENT TO EXHIBIT B

This Amendment amends Exhibit B to the Distributor Agreement, dated **Monday, April 22, 2013**, by and between **Flowers Baking Co. of Henderson, LLC** ("COMPANY") and **GNA Distributing Inc** ("DISTRIBUTOR").

DISTRIBUTOR'S existing exclusive Distribution Rights, pursuant to an Addendum to Bill of Sale executed herewith, is hereby amended to include the following Products:

1.   Cobblestone Bread Company

This grant of Distribution Rights is effective **April 10, 2014**.

IN WITNESS WHEREOF, COMPANY and DISTRIBUTOR have executed this Amendment this 28th day of March, 2014.

DISTRIBUTOR                                          COMPANY

By: Giovanni Martinez                                By: Tom Wilson

Its: President                                       Its: President

WITNESSES:                                           Attest:

FLO-MAR0000815

## ADDENDUM TO EXHIBIT C – AUTHORIZED PRODUCTS

In accordance with Section 2.3 of the Distributor Agreement by and between **Flowers Baking Co. of Henderson, LLC** ("COMPANY") and **GNA Distributing Inc** ("DISTRIBUTOR"), COMPANY hereby amends Exhibit C thereto to include the following Authorized Product(s):

1.   **TastyKake**

Pursuant to Section 2.3 of the Distributor Agreement, DISTRIBUTOR does not acquire any proprietary or ownership rights to such Authorized Products, exclusive or non-exclusive. DISTRIBUTOR's rights and obligations with respect to the above listed Authorized Products are provided for in the DISTRIBUTOR AGREEMENT and/or any subsequent Addenda.

COMPANY

BY: _____

TITLE: _____President_____

DATE: _____6/05/15_____

6736

FLO-MAR0000805

## ADDENDUM TO EXHIBIT C – AUTHORIZED PRODUCTS

In accordance with Section 2.3 of the Distributor Agreement by and between **Flowers Baking Co. of Henderson, LLC** ("COMPANY") and **GNA Distributing Inc** ("DISTRIBUTOR"), COMPANY hereby amends Exhibit C thereto to include the following Authorized Product(s):

   1.  **Dave's Killer Bread**

Pursuant to Section 2.3 of the Distributor Agreement, DISTRIBUTOR does not acquire any proprietary or ownership rights to such Authorized Products, exclusive or non-exclusive. DISTRIBUTOR's rights and obligations with respect to the above listed Authorized Products are provided for in the DISTRIBUTOR AGREEMENT and/or any subsequent Addenda.

COMPANY

BY: _____

TITLE:_____President_____

DATE:_____10/2/15_____

6736